# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

_____

Hazim Gulla; Ikhalas Gulla; Heather Gulla; Holly Gulla; Heidi Gulla; Darrel Davis; Barbara Davis; Elisa Kline, individually and as a parent/guardian of Mason Kline; Mason Kline in his own right; Ellen Eberhardt; Jimmy James; LaRosa Patrick; Helen Chapman; Damarius Chapman; Sade Chapman; Dionte Chapman; Tajuana Chapman; Tashiana Chapman; Kyeira Howell; Lashonda Jones; Dorothy Chapman, individually and as a parent/guardian of Shamiya Chapman, and as conservator of the estate of Lula Pearl Atkins-Nelson; Shamiya Chapman in her own right; Dequan Chapman; Harry Chapman; Michael Lymon; Deborah Chapman-Marshall; Frederick Marshall; Essie Chapman; Inez Marie Walker; Ronnie L. Walker; Shawana M. Walker; Steven W. Redmond; Jerome Chapman; Jeanette Chapman; Maurice Chapman; May Chapman; John W. Chapman; Bobbie Rodgers; Henry C. Biggs; Renita M. Coleman; Meleisa A. Betts; Angela Price; D'Anna N. Price; Aa'Niyah Evans; Artayah Price; Bobby Dean Grace; Terry Gravelle; Marilyn Doney-Gravelle, individually and as a parent/guardian of Angelina Doney; Angelina Doney in her own right; Annie M. Hicks; Joshua Hicks; LaQuantus Cardwell, individually and as a parent/guardian of Romero Cardwell and SirQron Cardwell; Romero Cardwell and SirQron Cardwell in their own right; Raven Neal; Kathleen Clifton and Carlton Butler, individually and as parents/guardians of Daniel Clifton and Debbie Mitchell-Butler; Daniel Clifton in his own right; Debbie Mitchell-Butler in her own right; Magnolia Younger; Ryan Younger; Gowon Younger; Tiesha Taylor, individually and as a parent/guardian of Damarrion E. Taylor, Mariah Taylor and Kaniya Taylor; Damarrion E. Taylor in his own right; Mariah Taylor in her own right; and Kaniya Taylor in her own right, Paula Brown,

|  |  |
|---|---|
| Plaintiffs, | Case No. 2:17-CV-10709 |
| vs. | Hon. Victoria A. Roberts |

1

Lockwood, Andrews & Newnam, P.C.; Lockwood, Andrews & Newnam, Inc.; Leo A. Daly Company; Veolia North America, LLC; Veolia North America, Inc.; Veolia Water North America Operating Services, LLC; Veolia Environment S.A.; Rowe Professional Services Company, f/k/a Rowe Engineering, Inc.; The State of Michigan; Governor Rick Snyder; The Michigan Department of Environmental Quality; The Michigan Department of Health and Human Services; Nick Lyon; Eden Victoria Wells, M.D.; Stephen Busch; Liane Shekter-Smith; Adam Rosenthal; Patrick Cook; Michael Prysby; Bradley Wurfel; Daniel Wyant; Edward Kurtz; Darnell Earley; Jerry Ambrose; Andy Dillon; R. Kevin Clinton; and Jeffery Wright,

                              Defendants.
_____

## FIRST AMENDED FEDERAL COURT COMPLAINT

## I.  <u>NATURE OF THE CASE</u>

1.     This case arises out of the actions and decisions made by various state actors in tandem with private contractors, which resulted in the contamination of Plaintiffs' water supply, and their exposure to toxic and hazardous substances, in their homes, schools, hospitals, workplaces and other public forums. With this suit, Plaintiffs seek to hold the persons and entities that caused this crisis accountable.

2.     For nearly five years, the City of Flint existed in a state of financial emergency during which the City was controlled by a Governor- appointed Emergency Financial Manager.  In 2014, in a questionable effort to save money, an Emergency Financial Manager, with the approval of the Michigan Department of

2

Treasury, and Michigan's Governor, authorized a switch to the Flint River as the City's sole water source.

3.     Plaintiffs are all residents of the City of Flint who, from April 25, 2014, to the present have suffered, and will continue to experience serious personal injury and property damage caused by the Defendants' deliberate indifference and misconduct.  Defendants were grossly negligent in making and/or approving the April 25, 2014 decision to substitute safe water supplied by the City of Detroit with highly corrosive and hazardous water from the Flint River. By failing to monitor the lead levels of the Flint River water from the individual taps of Flint homes and residences, schools, hospitals,  and other public locations, as well as the blood lead levels of Flint's children who were exposed to contaminated Flint River water, Defendants acted in bad faith by falsely assuring Flint residents for many months that the Flint River water coming into their homes was safe to consume and use, when Defendants knew, and/or had reason to believe, that these assurances were untrue.

4.     As early as 2011 it was known that use of the Flint River as the public source of water without proper anti-corrosive treatment would create a condition dangerous to health and property.

5.     Notwithstanding this knowledge, on April 25, 2014, Flint began to draw and distribute to its residents for consumption, water from the Flint River.

3

6.     In making this switch, the State of Michigan, the Michigan Department of Environmental Quality (MDEQ), the Governor-appointed Emergency Financial Managers, and various other named employees of those agencies, failed to implement a corrosion control protocol as required by the Safe Drinking Water Act, and otherwise failed to exercise reasonable care with regard to Flint's water system.  Absent mandatory corrosion controls, the acidic water of the Flint River coursed through unprotected pipes to residents and businesses - leaching lead and other harmful chemicals into the water along the way

7.     Within days of the introduction of Flint River water into the Flint pipelines, the noxious sight, taste, and smell of contaminated water flowing from the taps was apparent.  Defendants ignored this initial irrefutable evidence that the water they distributed to the City of Flint was highly corrosive, not fit for human consumption and dangerous for human use and exposure.

8.     During the months following April 25, 2014, evidence mounted that the Flint River water was not only unfit for human consumption, and use,  but was toxic and unsafe, causing lead poisoning of Flint's children and other serious medical conditions to Plaintiffs.

9.     In or about late 2014 or early 2015, a report disclosed a dramatic spike in elevated blood lead levels in Flint's youngest children as measured by State epidemiologists, with the upward spike coinciding precisely with the time frame

4

that Flint's children were exposed to the Flint River water in their homes, schools and other public locations.

10.   Also by late 2014 or early 2015, further evidence of the toxicity of Flint's water was revealed in water samples showing extraordinarily high levels of lead, as well as dangerously high levels of total Trihalomethanes, coliform, E. Coli and other bacteria.

11.   A highly publicized media report in October of 2014 stated that General Motors would no longer use Flint River water in its manufacturing facilities because the highly corrosive nature of the water was ruining auto parts and production machinery.  In fact, GM rejected the corrosive Flint River water, which resulted in an annual loss of $400,000 to Flint in revenue.

12.   All the while – despite public assurances of the safety of the toxic water – government offices in Flint quietly switched to bottled water while the citizens and business of Flint continued to drink dangerously contaminated water.

13.   Notwithstanding the mounting evidence to the contrary, Defendants continued to falsely assure Flint residents that the Flint River water was being properly treated, monitored and tested and that it was safe to consume and use until October 2015.

14.   Flint engaged and relied upon the professional services and expertise of three private engineering firms to review and evaluate its water distribution

system, ensure compliance with federal and state environmental regulations, and provide expert engineering advice to the City.

15.    As described more fully below, these private engineering firms failed to fulfill their professional duties in a reasonable manner, and deemed Flint's water compliant with governing environmental statutes and regulations.  In doing so, these firms provided false assurances of safety to Plaintiffs, further exacerbating the extent of the damage caused by their conduct.

## II.    <u>JURISDICTION AND VENUE</u>

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1343, which authorizes federal courts to hear civil rights cases.

17.    This Court has supplemental jurisdiction of the pendant state-law claims under 28 U.S.C. § 1367.

18.    Venue is proper in this Court because Plaintiffs' claims arose in this judicial district, in Flint, Genesee County, pursuant to 28 U.S.C. §§ 102, 139l (b).

19.    This Court has personal jurisdiction over each Defendant because a Michigan Court would have personal jurisdiction under Mich. Comp. Laws § 600.701 and Mich. Comp. Laws § 600.705.

20.    The Court has personal jurisdiction over the Private Engineering Defendants pursuant to MCL 600.705 and MCL 600.715 because each of them have personally availed themselves of the benefits and protections of the State of

Michigan. Each of the Engineering Defendants conducted business and committed torts in Michigan, by themselves and their agents and/or alter egos, which caused plaintiffs to suffer severe personal and property injuries in Michigan.

21.     This case arises out of the actions and decisions made by the State of Michigan and its actors, including Governor Rick Snyder and Flint Emergency Managers Edward Kurtz, Darnell Early and Jerry Ambrose, the Department of Environmental Quality ("MDEQ") and its employees, and the Michigan Department of Health and Human Services ("MDHHS") and its employees, and private engineering firms which resulted in the contamination of Plaintiffs' water supply, and their exposure to toxic and hazardous substances, in their homes, schools, hospitals, workplaces and other public forums.

## III.   <u>PARTIES</u>

### A.     **Plaintiffs**

22.     Plaintiff Hazim Gulla and his wife, Plaintiff Ikhalas Gulla, own a property on which they operate a business, Hazim Party Store, and reside, located at 2310 South Saginaw Street in Flint, Michigan. Their adult children, Plaintiffs Heather, Holly and Heidi, reside at the property as well.

23.     During the relevant time period, the municipal water being supplied to the Gullas' business and residence was highly toxic, contaminated, and hazardous to health and property.

24.     As a result of exposure to the contaminated water supply, since the summer of 2015 Plaintiff Hazim Gulla has suffered from physical injury, including but not limited to, persistent skin rashes, which require continued medical treatment. As a result of this and other injuries, he has endured great pain, suffering and profound emotional distress.

25.     As a result of the damage caused by the contaminated water supply, the Gullas have sustained damage to their property, including but not limited to costs associated with remediating the water service lines and plumbing as well as in the diminution of the value of their property.

26.     The members of the Gulla family, unaware of the nature and extent of toxicity of the water resulting from Defendants' knowing and intentional acts, and failures to act, regularly used the water for drinking, cooking, washing, bathing, washing dishes and clothes and other purposes. They also used the water in their operation of a convenience store on the same property.  The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and the use and enjoyment of the property of all members of the Gulla family. As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care. It has also interfered with the operation of their business causing a decrease in sales.

27.     Plaintiffs Barbara and Darrell Davis live in and own a home at 1910 Montclair Avenue in Flint, Michigan.

28.     Plaintiffs Barbara and Darryl Davis have suffered from skin problems including rashes and other medical issues, as a result of the water contamination.

29.     From 2014 through the present, Plaintiff Barbara Davis has been employed by Flint Community Schools, a school district headquartered in Flint, Michigan, and has worked in schools with high lead levels.

30.     As a result of the contaminated water supply, while working at Holmes STEM Academy, located at 6602 Oxley Drive, Flint, Michigan and Eisenhower Elementary School, 1235 Pershing Street Flint, Michigan two Flint Community Schools, Plaintiff Barbara Davis developed skin rashes.

31.     As a result of the contaminated water supply, on several occasions beginning in approximately August 2015 and ending in approximately April 2016, Plaintiff Barbara Davis has been forced to move out of her home in Flint.  Thus, the family was separated with Plaintiff Darryl Davis remaining in Flint and his wife living in either Nevada or Louisiana.

32.     After having abated while away from her home, each time she returned to Flint, Plaintiff Barbara Davis's skin rashes recurred.

33.     Plaintiffs Barbara and Darrell Davis also endured pain, suffering and profound emotional distress as a result of the water contamination.

34.    As a result of the damage caused by the contaminated water supply, the Davis's have sustained damage to their property, including but not limited to costs associated with remediating the water service lines and plumbing as well as in the diminution of the value of the property.

35.    The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by Plaintiffs Barbara and Darrell Davis.  As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

36.    Plaintiff Elisa Kline and her minor child, Plaintiff Mason Kline, age eight, currently reside at 5419 West Tropicana Ave., Apt. 1301, Las Vegas, Nevada, but resided in Flint, Michigan during the relevant time period.

37.    As a result of exposure to the contaminated water supply in Flint, Plaintiff Mason Kline has suffered from physical injury, including but not limited to, a skin rash and lead poisoning.

38.    As a result of exposure to the contaminated water supply in Flint, Plaintiff Elisa Kline has suffered from physical injury, including but not limited to, a skin rash and hair loss.

39.    The contamination of their water supply unreasonably interfered with

10

all aspects of daily living, quality of life and use and enjoyment of the property by Plaintiffs Elisa and Mason Kline. As a result, they have incurred substantial expense in coping with the inconvenience and disruption it caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

40. Plaintiff Ellen Eberhardt lives in and owns a home at 913 Johnson Avenue in Flint, Michigan with Plaintiff Jimmy James.

41. Plaintiff Ellen Eberhardt developed skin conditions and an E. Coli infection in her leg after using the contaminated water in her home for wound care, following surgery which left her with open wounds.

42. The E. Coli infection persisted for approximately nine months, significantly prolonging the healing process and causing her severe pain and suffering.

43. Plaintiff Ellen Eberhardt also experienced significant emotional distress and mental pain and suffering as a result of the contaminated and toxic water causing her E. Coli infection and its sequelae.

44. As a result of using the contaminated water supplied to the home, Plaintiff Jimmy James developed skin rashes.

45. As a result of the damage caused by the contaminated water supply, Plaintiff Ellen Eberhardt sustained damage to her property, including but not

limited to costs associated with remediating the water service lines and plumbing as well as in the diminution of the value of the property.

46.     The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and the use and enjoyment of their property by Plaintiffs Ellen Eberhardt and Jimmy James. As a result they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

47.     Plaintiff LaRosa Patrick resides at 4224 Comstock Avenue in Flint, Michigan.

48.     Plaintiff LaRosa Patrick has also developed skin rashes, and other medical conditions from contact with the contaminated water.

49.     As a result of the toxic water supply, Plaintiff LaRosa Patrick suffers from severe anxiety, and mental pain and suffering related to living with contaminated water and without access to clean and healthy water.

50.     The contamination of the water supply has unreasonably interfered with all aspects of Plaintiff LaRosa Patrick's daily living, quality of life and use and enjoyment of their property. As a result, she has incurred substantial expense in coping with the inconvenience and disruption it has caused in her life, including but not limited to the cost of bottled water, transportation, and medical care.

51.     Plaintiff Helen Chapman resides at 1204 West Coldwater Road, Flint, Michigan with her adult children, Plaintiffs Sade Chapman, Dionte Chapman, Tajuana Chapman and Lashonda Jones. Plaintiff Dorothy Chapman also resides at 1204 West Coldwater Road, Flint, Michigan with her seventeen year-old minor child, Plaintiff Shamiya Chapman.

52.     As a result of exposure to the contaminated water supply, Plaintiff Helen Chapman developed skin rashes and suffered hair loss.

53.     The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by the members of Plaintiff Helen Chapman's household.  As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

54.     Plaintiff Damarius Chapman resides at 2409 Winona Street, Flint, Michigan.

55.     Plaintiff Dorothy Chapman is the conservator for the estate of her aunt, Lula Pearl Atkins-Nelson, who owned and lived in a home located at 5802 Edwards Ave., Flint, Michigan, before she passed away on January 15, 2016.

56.     Before her death, and as a result of exposure to the contaminated water supply, Plaintiff Lula Pearl Atkins-Nelson suffered from a severe bacterial

13

infection in McLaren hospital.  Plaintiff Dorothy Chapman brings a survival action

on behalf of her aunt, pursuant to Mich. Comp. Laws Serv. § 600.2921.

57.    Plaintiff Dequan Chapman resides at Suncrest Drive, Apt. 703, Flint,

Michigan.

58.    As a result of exposure to the contaminated water supply, Plaintiff

Dequan Chapman developed skin rashes.

59.    The contamination of Plaintiff Dequan Chapman's water supply has

unreasonably interfered with all aspects of his daily living, quality of life and use

and enjoyment of the property.  As a result, he has incurred substantial expense in

coping with the inconvenience and disruption it has caused in his life, including

but not limited to the cost of bottled water, transportation and medical care.

60.    Plaintiff Harry Chapman currently resides at 8234 Kensington Blvd,

Apt. 299, Building 6, Davison, Michigan, but resided in Flint, Michigan during the

relevant time period.

61.    Plaintiff Deborah Chapman-Marshall resides at 5802 Edwards

Avenue in Flint, Michigan, with her husband, Plaintiff Frederick Marshall.

62.    Plaintiffs Tashiana Chapman, Michael Lymon and Kyeira Howell all

reside at 31001 Suffolk Court, Flushing, Michigan, but resided in Flint, Michigan

during the relevant time period.

63.    Plaintiff Essie Chapman lives in and owns a home located at1701

14

Chelsea Circle in Flint, Michigan, with her adult daughter, Plaintiff Inez Marie Walker, her son-in-law, Plaintiff Ronnie L. Walker, and her adult grandchildren Plaintiffs Shawana M. Walker and Steven W. Redmond.

64.     As a result of the damage caused by the contaminated water supply, Plaintiff Essie Chapman has sustained damage to her property, including but not limited to costs associated with remediating the water service lines and plumbing as well as in the diminution of the value of the property.

65.     The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Plaintiff Essie Chapman's household.  As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

66.     Plaintiffs Jerome Chapman, Jeanette Chapman and Maurice Chapman reside at 1321 Ida Avenue in Flint, Michigan.

67.     As a result of exposure to the contaminated water supply, Plaintiff Jerome Chapman developed skin rashes.

68.     The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Plaintiff Jerome Chapman's household.  As a result

they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

69.   Plaintiff May Chapman resides at 5472 Bermuda Lane, Flint, Michigan.

70.   As a result of exposure to the contaminated water supply, Plaintiff May Chapman developed skin rashes and other medical conditions.

71.   The contamination of their water supply has unreasonably interfered with all aspects of Plaintiff May Chapman's daily living, quality of life and use and enjoyment of her property.   As a result, she has incurred substantial expense in coping with the inconvenience and disruption it has caused in her life, including but not limited to the cost of bottled water, transportation and medical care.

72.   Plaintiffs John W. Chapman and Bobbie Rodgers reside at 6145 LeBeau Street, Mount Morris, Michigan, but resided in Flint, Michigan during the relevant time period.

73.   As a result of exposure to the contaminated water supply, Plaintiff John W. Chapman developed skin rashes.

74.   As a result of exposure to the contaminated water supply, Plaintiff Bobbie Rodgers developed skin rashes.

75.   The contamination of their water supply has unreasonably interfered

16

with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Plaintiff John Chapman's household.  As a result they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

76.     Plaintiffs Henry C. Biggs and Renita M. Coleman reside at 776 E. Philadelphia Blvd., Flint, Michigan.

77.     As a result of exposure to the contaminated water supply, Plaintiff Renita Coleman developed skin rashes.

78.     The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Plaintiff Henry C. Biggs' household.  As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

79.     Plaintiff Melesia A. Betts lives in and owns a home at 3910 Circle Drive, Apt. 1, Flint, Michigan.

80.     As a result of exposure to the contaminated water supply, Plaintiff Melesia A. Betts suffered from skin rashes, hair loss, emotional distress, mental pain, and other medical conditions.

81.     As a result of the damage caused by the contaminated water supply, Plaintiff Melesia A. Betts sustained damage to her property, including but not limited to costs associated with remediating the water service lines and plumbing as well as in the diminution of the value of the property.

82.     The contamination of their water supply has unreasonably interfered with all aspects of Melesia A. Betts' daily living, quality of life and use and enjoyment of her property.  As a result, she has incurred substantial expense in coping with the inconvenience and disruption it has caused in her life, including but not limited to the cost of bottled water, transportation and medical care.

83.     Plaintiff Angela Price resides at 6169 Eagle Ridge Lane, Apt. 204, Flint, Michigan, with her adult child, Plaintiff D'Anna N. Price, and her two minor children, Plaintiffs Aa'Niyah Evans, age three and Artayah Price, age thirteen.

84.     As a result of exposure to the contaminated water supply, Plaintiffs D'Anna N. Price, Aa'Niyah Evans and Artayah Price suffered from skin rashes and hair loss.

85.     As a result of exposure to the contaminated water supply, Plaintiff Angela Price developed skin rashes and other medical conditions.

86.     The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Plaintiff Angela Price's household.  As a result, they

18

have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

87.     Plaintiff Bobby Dean Grace resides at 2063 Mill Road, Apt. 4, Flint, Michigan.

88.     Plaintiff Terry Gravelle lives in and owns a home located at 1609 Illinois Avenue, Flint, Michigan with his wife, Plaintiff Marilyn Doney-Gravelle and her minor child, Plaintiff Angelina Doney, age seven.

89.     As a result of exposure to the contaminated water supply, Plaintiff Angelina Doney developed skin rashes and other medical conditions.

90.     As a result of exposure to the contaminated water supply, Plaintiff Terry Gravelle developed lead poisoning and skin rashes.

91.     As a result of exposure to the contaminated water supply, Plaintiff Marilyn Doney-Gravelle developed skin rashes.

92.     As a result of the damage caused by the contaminated water supply, Plaintiff Terry Gravelle has sustained damage to his property, including but not limited to costs associated with remediating the water service lines and plumbing as well as in the diminution of the value of the property.

93.     The contamination of Plaintiff Terry Gravelle's water supply has unreasonably interfered with all aspects of his family's daily living, quality of life

and use and enjoyment of the property.  As a result, Plaintiff Terry Gravelle's household has incurred substantial expense in coping with the inconvenience and disruption it has caused in his life, including but not limited to the cost of bottled water, transportation and medical care.

94.    Plaintiffs Annie M. Hicks and Joshua Hicks live in and own a home located at 3220 Westwood Parkway, Flint, Michigan.

95.    As a result of exposure to the contaminated water supply, Plaintiff Annie M. Hicks developed skin rashes.

96.    As a result of exposure to the contaminated water supply, Plaintiff Joshua Hicks developed skin rashes.

97.    The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Hicks' household.  As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

98.    Plaintiff LaQuantus Cardwell resides at 1610 Forest Hill Avenue, Flint, Michigan with her adult child Plaintiff Raven Neal, and her minor children Plaintiffs Romero Cardwell, age twelve and SirQron Cardwell, age thirteen.

99.    As a result of exposure to the contaminated water supply, Plaintiff

Romero Cardwell developed skin rashes.

100.   As a result of exposure to the contaminated water supply, Plaintiff SirQron Cardwell suffers from lead poisoning.

101.   As a result of exposure to the contaminated water supply, Plaintiff LaQuantus Cardwell developed skin rashes.

102.   As a result of exposure to the contaminated water supply, Plaintiff Raven Neal developed skin rashes.

103.   The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Plaintiff LaQuantus Cardwell's household.  As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

104.   Plaintiff Kathleen Clifton currently resides at 2655 Ridgecrest Court, Flint, Michigan with her husband, Carlton Butler and their two minor children, Plaintiffs Daniel Clifton, age three, and Debbie Mitchell-Butler, age one.

105.   Plaintiff Daniel Clifton's blood lead levels to date reveal excessive amounts of lead in his body, as high as 14 micrograms per deciliter.  The presence of high levels of lead in Plaintiff Daniel Clifton's blood has caused him severe injuries.

21

106.   As a result of exposure to the contaminated water supply, Plaintiff Carlton Butler developed skin rashes.

107.   Plaintiffs Kathleen Clifton and Carlton Butler have experienced significant emotional distress and mental pain and suffering as a result of the contaminated and toxic water.

108.   While Plaintiff Debbie Mitchell-Butler, age one, has yet to exhibit signs or symptoms of lead-related health issues, she remains at risk for these problems in the future, necessitating diagnostic testing for the purpose of early intervention.

109.   The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Clifton-Butler household.   As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

110.   Plaintiff Magnolia Younger resides at 6932 Yorkshire Drive, Flint, Michigan.

111.   During the relevant time period, Magnolia Younger's adult children, Plaintiffs Ryan Younger and Gowon Younger, also resided at 6932 Yorkshire Drive, Flint, Michigan.

112.  As a result of exposure to the contaminated water supply, Plaintiff Magnolia Younger has suffered from physical injuries including a serious infectious skin condition requiring ongoing medical treatment. As a result of this and other injuries, she has suffered from great pain, suffering and profound emotional distress.

113.  As a result of exposure to the contaminated water supply, Plaintiff Gowon Younger developed skin rashes.

114.  Plaintiffs Ryan and Gowon Younger have also experienced significant emotional distress and mental pain and suffering as a result of the contaminated and toxic water.

115.  The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Magnolia-Younger's household.  As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

116.  Plaintiff Tiesha Taylor resides at 2324 Lapeer Road, Apt. 106, Flint, Michigan with her three minor children, Plaintiff Kaniya L. Taylor, age twelve, Plaintiff Damarrion E. Taylor, age nine, and Plaintiff Mariah Taylor, age six.

117.  As a result of exposure to the contaminated water supply, Plaintiff

Damarrion E. Taylor has suffered from significant physical injuries, including bacterial infections requiring hospital admissions., As a result of this and other injuries, he has experienced great pain, suffering and profound emotional distress.

118.   As a result of exposure to the contaminated water supply, Plaintiffs Kaniya L. Taylor and Mariah Taylor developed, among other things, skin rashes.

119.   As a result of exposure to the contaminated water supply, Plaintiff Tiesha Taylor suffered hair loss.

120.   Plaintiff Tiesha Taylor also experienced significant emotional distress and mental pain and suffering as a result of her family's exposure to contaminated and toxic water.

121.   The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life and use and enjoyment of the property by all members of Taylor household.   As a result, they have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

122.   Plaintiff Paula Brown resides at 3521 Brown Street, Flint, Michigan.

123.   As a result of exposure to the contaminated water supply, Plaintiff Paula Brown suffers from skin rashes, emotional distress and mental pain.

124.   The contamination of Paula Brown's water supply has unreasonably

24

interfered with all aspects of her daily living, quality of life and use and enjoyment of property.  As a result, she has incurred substantial expense in coping with the inconvenience and disruption it has caused in her life, including but not limited to the cost of bottled water, transportation and medical care.

125.   Plaintiffs have all suffered unknown physical injuries as a result of lead exposure through their drinking water.

126.   The contamination of Plaintiffs' water supply has unreasonably interfered with all aspects of Plaintiffs' daily living, quality of life and use and enjoyment of their property.  As a result, Plaintiffs have incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

**B.   Defendants**

## <u>MDEQ</u>

127.   Defendant   Michigan   Department   of   Environmental   Quality ("MDEQ") is the State Agency responsible for implementing safe drinking Federal and State water laws, rules, and regulations in Michigan, including the City of Flint, Michigan.

128.   MDEQ failed to require corrosion control for Flint River water in violation of the Federal Lead and Copper Rule.

129.    MDEQ misled the Environmental Protection Agency ("EPA") which, on numerous occasions, attempted to sample the water quality in Flint, Michigan.

130.    MDEQ conducted illegal and improper sampling of Flint's water and lied to, and mislead the public about the safety of Flint's water.

131.    MDEQ publicly discredited experts Miguel Del Toral of the EPA and Dr. Mark Edwards of the Virginia Polytechnic Institute and State University, who proffered indisputable evidence of Flint's water contamination.

132.    Stephen Busch, Patrick Cook, Michael Prysby, Bradley Wurfel, Liane Shekter-Smith, and Adam Rosenthal (together, "MDEQ Defendants") are, or were at all relevant times herein agents and employees of the State of Michigan employed by the MDEQ, and acting within the scope of their respective employment and authority.

133.    Daniel Wyant ("Wyant") was at all relevant times the Director of MDEQ.   MDEQ, through Wyant, participated in the decisions that deliberately created, increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative.   Further, MDEQ, through Wyant, assured Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that this assurance was false.

134.    MDEQ, acting through its agents identified hereinabove and below,

and as set forth below, knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving the decision to switch the water source when on notice of the dangers associated with same

a. Stephen Busch ("Busch") was at all relevant times District Supervisor assigned to the Lansing District Office of the MDEQ and was acting within the scope of his employment and/or authority. MDEQ, through Busch, knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving the decision to switch the water source when he was on notice of the dangers associated with same.

b. MDEQ, through Busch, further falsely reported that anti-corrosive agents had been used to treat the highly corrosive Flint River water and thereby provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

c. Patrick Cook ("Cook") was at all relevant times Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ and was acting within the scope of his employment and/or authority. Cook, knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving

27

the decision to switch the water source when he was on notice of the dangers associated with same.

d. Cook further failed to properly monitor and test the Flint River water, he falsely reported to the EPA that the Flint River water was treated with anti-corrosive chemicals, and he provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

e. Michael Prysby ("Prysby") was at all relevant times Engineer assigned to District 11 (Genesee County) of the MDEQ and was acting within the scope of his employment and/or authority. Prysby knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving the decision to switch the water source when he was on notice of the dangers associated with same.  Further, MDEQ failed to properly monitor and test the Flint River water and provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

f. Bradley Wurfel ("Wurfel) was at all relevant times the Director of Communications for MDEQ and was acting within the scope of his

28

employment and/or authority. Wurfel was forced to resign on December 29, 2015 due to his "persistent [negative] tone and derision" and his "aggressive dismissal, belittlement and attempts to discredit the individuals involved in [conducting independent studies and tests]."March 2016 Flint Water Advisory Task Force Final Report, p. 2, available at https://www.michigan.gov/documents/snyder/ FWATF_FINAL_REPORT_21March2016_5178057.pdf.

g. Wurfel, as Director of Communications, was responsible for the deliberate, misleading and inaccurate communications that increased and prolonged the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic alternative. He further knowingly provided false assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

h. Liane Shekter-Smith ("Smith") was at all relevant times Chief of the Office of Drinking Water and Municipal Assistance for MDEQ and acting within the scope of her employment and/or authority, holding that position until October 19, 2015. Smith knowingly approved of, and thereby participated in, the decisions that created, increased and

prolonged the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic alternative. She further provided false assurances to Plaintiffs and the public that the Flint River water was safe when she was on actual notice and/or had reason to believe that these assurances were false.

i.   Adam Rosenthal ("Rosenthal") was at all relevant times a Water Quality Analyst assigned to the Lansing District Office of the MDEQ and acting within the scope of his employment and/or authority.

j.   Rosenthal, as Water Quality Analyst for the MDEQ, knowingly approved of, and thereby participated in, the decisions that created, increased and prolonged the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic alternative. He further provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice and/or had reason to believe that these assurances were false.

## MDHHS

135.   The Michigan Department of Health and Human Services ("MDHHS") is the State Agency responsible for protecting the health and well-being of Michigan residents.

136.   Eden Victoria Wells, M.D. ("Wells") was at all relevant times herein

an agent and employee of the State of Michigan employed by Defendant MDHHS, and acting within the scope of her respective employment and authority.

137.   Wells was at all relevant times Chief Medical Executive within the Population Health and Community Services Department of the MDHHS and was acting within the scope of her employment and/or authority. Through Wells, MDHHS knowingly created, increased and prolonged the hazards that arose from replacing safe drinking water with a highly toxic alternative. Through Wells, MDHHS knew as early as 2014 about the highly unusual spike in elevated blood lead levels and cases of legionella bacteria in Flint water users and, notwithstanding a legal duty to notify the public, failed to do so, and instead concealed these facts from Flint residents, including Plaintiffs.

138.   Nick Lyon ("Lyon") was at all relevant times herein an agent and employee of the State of Michigan employed by MDHHS, and acting within the scope of his respective employment and authority.

139.   Lyon was at all relevant times Director of the MDHHS and was acting within the scope of his employment and/or authority.  Through Lyon, MDHHS knowingly created, increased and prolonged the hazards that arose from replacing safe drinking water with a highly toxic alternative. Through Lyon, MDHHS knew as early as 2014 about the highly unusual spike in elevated blood lead levels and cases of legionella bacteria in Flint water users and, notwithstanding a legal duty to

notify the public, failed to do so, and instead concealed these facts from Flint residents, including Plaintiffs.

### Emergency Managers

140.  Defendant Emergency Manager Ed Kurtz ("Kurtz") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder in 2012, and served in this capacity until November 1, 2013.Kurtz is and was at all relevant times a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately created, increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative.  He is sued in his individual and official capacities.

141.  Defendant Emergency Manager Darnell Earley ("Earley") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder on November 1, 2013, and served in this capacity until January 12, 2015. Earley is, and was at all relevant times a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately created, increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative.  He is sued in his individual and official capacities.

142.   Defendant Emergency Manager Gerald Ambrose ("Ambrose") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder on January 13, 2015 and served in this capacity until April 28, 2015. Ambrose is and was at all relevant times a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative. He is sued in his individual and official capacities.

143.   Defendants Kurtz, Early and Ambrose (the "Emergency Managers") continuously controlled all the Flint governmental functions, decisions and fiscal decisions from 2012 through April 30, 2015 pursuant to State Statute.

144.   The Emergency Managers at all times relevant hereto were acting within and outside the scope of their employment and/or authority under color of law.

145.   Emergency Managers, acting in concert with  State Treasurer Andy Dillon, County Drain Commissioner Jeffery Wright, MDEQ, and MDHHS, made the decision to switch to Flint River water and enabled Flint's water treatment plant from not properly analyzing and treating this water with an anti-corrosive, and  making it safe.

33

146.    Defendant Emergency Managers ignored warning signs and were integral in defrauding, misrepresenting and falsifying information relating to the property and financial affairs of Flint as it affected its citizenry.

147.    Defendant Emergency Managers provided assurances to Plaintiffs and the public that the Flint River water was safe when they were on actual notice and/or had reason to believe that these assurances were false. Through these false representations, Defendant Emergency Managers permitted the Flint River water to poison thousands of Flint residents and damage Flint homes.

## The State of Michigan, Governor Rick Snyder State Treasurers Andy Dillon and R. Kevin Clinton

148.    Defendant Rick Snyder is the Governor of Michigan and is invested with executive power pursuant to Article V, Section 1, of the Michigan Constitution.  The Governor is and was at all relevant times the official policy-maker for Defendant State of Michigan, and, as such, was responsible for the management of State government and for the health and welfare of its citizens and residents.

149.    Defendant State of Michigan operates the MDEQ and MDHHS.

150.    Defendant State of Michigan, acting through the Governor's office, and/or the MDEQ, MDHHS, and its official policy-makers, and/or Defendants Kurtz, Early, and Ambrose, made the final decisions that deliberately created,

increased, and/or prolonged the hazards, threats, and dangers that arose by replacing safe drinking water with a highly toxic alternative and affirmatively acting to fraudulently conceal the public health emergency they created and/or failed to take adequate steps to remediate and abate.

151.   Andy Dillon ("Dillon") was Treasurer for the State of Michigan and is sued by Plaintiffs in his individual capacity because he, along with the Governor and others, caused harm to Plaintiffs when they developed an interim water delivery plan in June 2013 which favored the predominately white Genesee County water users and discriminated against the water users in Flint, a predominately African American community.

152.   R. Kevin Clinton ("Clinton") was Treasurer for the State of Michigan and is sued by Plaintiffs in his individual capacity because he, along with the Governor and others, caused harm to Plaintiffs when he was directly informed by Earley on November 21, 2013, and April 8, 2014, that before the Flint River could be used as a source of Drinking Water for Flint Residents significant upgrades and improvements of the Flint Water Treatment Plant were necessary, and not made by Earley before April 25, 2014[1].   Clinton specifically approved actions by Earley which allowed the source of drinking water in Flint to be switched from the DWSD to the Flint River.   These actions by Clinton favored the predominately

---

[1] Earley made the same report to Clinton on July 8, 2014.

white Genesee County water users and discriminated against the water users in Flint, a predominately African American community.

## Genesee County Drain Commissioner Jeffery Wright

153.   Jeffery Wright ("Wright") has been the Genesee County Drain Commissioner since 2001.  Wright is sued in his individual capacity because, as the Genesee County Drain Commissioner, he conspired with other Defendants, including State of Michigan Defendants, to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the Amendment of the United States Constitution.

## Private Engineering Defendants

154.  Defendant Rowe Professional Services Company f/k/a Rowe Engineering, Inc. ("Rowe") is a Michigan Corporation with its principal place of business located at 540 S. Saginaw Street, Suite 200, Flint, Genesee County, Michigan 48502.

155.  Rowe maintains an office in Flint, Genesee County, Michigan, regularly conducts business in Flint, Michigan, and has committed torts in Flint, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

156.  Rowe falsified information and ignored warning signs related to the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic alternative.

157.  Rowe is a private individual Defendant in this action based on its examinations, findings, and reports as related to the condition of the Flint River and the Flint Water Treatment Plant.  Specifically, Rowe is liable for its grossly negligent conduct, including declaring the Flint River water as safe to drink, recommending approval of the use of Flint River water in the Flint Water Treatment Plant, and falsely representing that the connection between the Flint River and the Flint Water Treatment Plant had been performed properly and safely. Rowe's conduct caused significant harm to Plaintiffs persons and property.

158.  Defendant Lockwood, Andrews & Newnam, P.C., ("LAN PC") is a Michigan professional corporation based in Flint, Michigan.  Upon information and belief, LAN PC was incorporated in 2008 by Lockwood, Andrews & Newnam, Inc. ("LAN Inc.") after it was retained by the City of Flint to conduct studies of and reports on the feasibility of a new water supply for the City.  LAN PC was hired by Defendants to provide professional engineering services to place the Flint Water Treatment Plant into operation for using the Flint River as a primary water drinking source, and to continue to operate the Water Treatment Plant to maintain the delivery of the Flint River-sourced water to Flint.

159.   Defendant LAN Inc. is a Texas corporation with its principal place of business at 2925 Briarpark Drive, Suite 400, Houston, Texas 77042. At all relevant times, LAN Inc. conducted business in Genesee County through Defendant LAN PC. Per its website, LAN Inc.'s Michigan office is located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. holds itself out as a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design.

160.   Defendant Leo A. Daly Company ("LAD") is a Nebraska corporation with its principal place of business at 8600 Indian Hills Drive, Omaha, Nebraska 68114. Per its website, LAD's "[s]ervices are extended through [LAN Inc.]."LAD's own website reveals that it advertises itself to the world as having "experience, creativity and technical experience … in every service we offer[,]" which includes "[p]lanning, architecture, *engineering* and interior design, and program management [] delivered by multidisciplinary teams hand-picked to provide the precise combination of expertise required for project success." Additionally, LAD states that "[a]s a multi-disciplinary firm, *engineering is an integral part of **our** process* from the beginning of each project.  *Our engineers* work closely with planners, architects and interior designers ….  *Our in-house engineers* also provide services for engineering projects independent of

38

architectural design services."

161.   The corporate structure of LAD and LAN Inc. is such that LAD exerts nearly unfettered control over its subsidiary. The top executives between these Defendants are identical – Leo A. Daly, III serves as Chairman and CEO of both LAD and LAN Inc., and Dennis W. Petersen is the President of both. Three of LAN Inc.'s seven directors are high ranking LAD executives, including Mr. Daly, Mr. Petersen and James B. Brader, the CFO of LAD.  While LAN Inc. does not appear to retain a CFO, LAD's CFO is one of LAN Inc.'s seven board members. On information and belief, Mr. Brader serves as the *de facto* CFO of LAN Inc. and controls LAN Inc.'s finances. LAD and LAN Inc. share offices in Houston (LAN Inc.'s principal place of business), Los Angeles and Miami.

162.  Defendants LAN PC, LAN Inc. and LAD (collectively the "LAN Defendants" or "LAN") are defendants in this action based on their collective failure to properly place the Flint Water Plant into operation using the Flint River as a primary source, specifically neglecting to ensure the viability of the water source for use by the public, and failing to insist upon and implement the necessary safeguards through the plant to allow the water to be safely consumed by the public, and failure to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

163.   The LAN Defendants maintain an office in Flint, Genesee County, Michigan; they regularly conduct business in Flint, Genesee County, Michigan; and they have committed a tort in Flint, Genesee County, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

164.   Defendant Veolia North America, LLC ("Veolia LLC") is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

165.   Defendant Veolia North America Inc. ("Veolia Inc.") is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

166.   Defendant Veolia Water North America Operating Services, LLC ("Veolia Water") is a Delaware Limited Liability Company with its principal place of business at 101 W. Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

167.   Veolia LLC, Veolia Inc. and Veolia Water design and provide water solutions for communities and industries across North America under the banner "Veolia North America."

168.   Defendant Veolia Environment S.A.("Veolia S.A.") is a French transnational corporation with its principal place of business at 36-38 Avenue Kleber, 75116, Paris, France.  Veolia S.A. provides its services through, and thus

derives its revenues from, its four global divisions — water management, waste management, public transport and energy services.   The divisions provide its services across the globe, and in North America, those services are provided under the aforementioned moniker "Veolia North America."

169.  In or around 2005, Veolia S.A. united these four global divisions under a single umbrella, and since then, has held out itself and all other Veolia entities to the world simply as one "Veolia."   Indeed, Veolia S.A. adopted this simple "Veolia" branding across all of its businesses, which is evidenced on its website and press releases.

170.  The four global divisions are composed of the subsidiaries and other businesses owned and otherwise controlled by Veolia S.A.

171.  Veolia S.A. and its divisions also underwent a restructuring beginning around 2011. As described by Veolia S.A. Chair and CEO Antoine Frerot, "[o]ur new organization is based on some simple principles—operating as an integrated company, _establishing a single Veolia in each country_, setting up regional management teams and strengthening corporate management functions." Veolia 2013 Annual and Sustainability Report at 10 (emphasis added), available at http://www.veolia.com/en/2013-activity-and-sustainability-report.        Stated differently, "[t]he new Veolia is one Veolia." _Id._ at 14.

172.  As a result, the corporate structure of Veolia S.A., Veolia LLC, Veolia

41

Inc. and Veolia Water (collectively, the "Veolia Defendants" or "Veolia") is such that Veolia S.A. exerts nearly unfettered control over the entire Veolia empire. The Veolia Defendants hold themselves out to the world as a single entity, examples of which are numerous and readily observed in the public domain.

173.   For example, the Veolia website makes no effort to distinguish or advertise any distinct legal entities, instead grouping them together and collectively presenting themselves to the world as "Veolia."   When "Veolia" advertises the number of its employees and reports its annual revenue, it does so collectively.

174.   Upon information and belief, the Veolia Defendants are controlled by the same top executives, and revenues are commingled and reported as one.

175.   As such, the Veolia Defendants disregard corporate formalities and do not adequately or separately capitalize each of their respective businesses.

176.   The Veolia Defendants collectively maintain several offices in Michigan, including in Westland, Livonia and Grand Rapids; regularly conduct business in Michigan; and have committed torts in Michigan, which are bases for personal jurisdiction in this Court pursuant to MCL § 600.715.

177.   The Veolia Defendants are parties to this action based upon providing professionally negligent engineering services in reviewing Flint's water system and declaring the water safe to drink.

178.   The Veolia Defendants have abused the corporate form to avoid

42

liability in this matter. Indeed, while it appears Veolia Water may have executed the subject contract with the City of Flint, the Veolia Defendants, together, as indistinguishable entities, perform the services which are the subject matter of this lawsuit and presented their conclusions as "Veolia." At all times relevant, the Veolia Defendants have represented to the world that they are not distinct legal entities but rather one and the same.

## IV.     STATEMENT OF FACTUAL ALLEGATIONS

### A.     Factual Allegations Relating to the Private Engineering Defendants[2]

#### i.     Consideration of and Decision to Change Source of Flint Water: Studies Warned of Dangers with Use of Flint River Water

179.   Plaintiffs re-allege and incorporate by reference and make a part hereof, all previous paragraphs as though each were fully set forth herein and restated.

180.   Like the residents of any American city, residents of Flint rely on a steady supply of safe and clean water to use in the course of their daily lives. Flint also has commercial and other non-residential properties whose owners rely upon clean and safe water.

181.   The FWTP was constructed in 1917 to draw water from the Flint

---

[2]The term "Private Engineering Defendants" refers collectively to the Veolia, LAN and Rowe Defendants.

River as the source of Flint's drinking water for nearly 50 years until 1964.

182.   As early as 1964, the U.S. Geological Survey noted high levels of chloride in the Flint River.  Due to the concerns regarding the adequacy of the Flint River to provide safe drinking water, Flint evaluated alternatives for a new water supply, and ultimately switched providers. From 1964 to 2014, Flint water users received their water from Lake Huron via purchase from the Detroit Water and Sewerage Department ("DWSD"). This water did not require treatment through the FWTP.

183.   During this half-century, Flint water users enjoyed safe, clean, fresh water in their homes, businesses, hospitals and other places of public services.

184.   However, since approximately the 1990s, Flint and other local governmental entities had growing concerns over the cost of the DWSD water supply. Amidst these growing concerns, Flint and the other local governmental entities, which included Genesee County, Lapeer County and Sanilac County, commissioned studies for alternative water supplies. Certain studies were completed in 1992.

185.   A 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities as well as petroleum and gasoline cleanups.

186.   In 2004, a technical assessment of the Flint River raised concerns

about using the river as a source of drinking water. One of the key points from the technical assessment, entitled "Source Water Assessment Report for the City of Flint Water Supply – Flint River Emergency Intake," prepared by the U.S. Geological Survey, the MDEQ, and the Flint Water Utilities Department, was that the Flint River was a highly sensitive drinking water source that was susceptible to contamination.

187. Flint and the local governmental entities again commissioned studies for alternative water supplies, which were completed in 2006 and 2009.

188. The 2009 study, prepared by Rowe, LAN and others, evaluated two alternatives for water supply – continue to purchase from DWSD or construct a new pipeline (later known as the Karegnondi Water Authority ("KWA") pipeline) from Lake Huron.

189. In 2011, Flint government officials commissioned a study (or studies) by LAN and Rowe to determine if the Flint River could be safely used by the City as the primary source of drinking water. One of those studies, entitled "Analysis of the Flint River as a Permanent Water Supply for the City of Flint"(the "2011 Report"), which bore LAN's and Rowe's respective logos, was published in July of 2011.

190. The 2011 Report stated that chemically treating Flint River water on a continuous basis would be a challenge and more expensive than chemically

45

treating lake water. It concluded that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron Water . . . . Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron."  The study further concluded that such treatments to Flint River water could be done if improvements were made to the FWTP. However, if used as a water supply, the study noted that "a source water protection management plan should be developed to . . . identify potential sources of contamination . . . ."

191.  LAN also prepared an additional analysis, attached to the 2011 Report as an appendix, which detailed over $69 million in improvements that would have to be made to bring the FWTP up to current standards. This additional analysis specifically projected costs for corrosion control chemicals that would be required to ensure the safety of water to be drawn from the Flint River.

### ii.   *Rowe Served As City Engineer for Flint During the Relevant Time Period*

192.  The Flint City Charter requires the City to have a City Engineer. Moreover, in order to receive State and Federal funding for projects, it is mandatory for Flint to have a City Engineer to certify and submit required documentation.

193.  In 2007, Rowe was awarded the job to provide professional engineering services as City Engineer to Flint for a five-year period. Rowe

provided those services to Flint pursuant to City Contract 07-103 under the broad categories of engineering, surveying, and project management / administration (both design and construction) and technical assistance.

194.   In January of 2012, Flint Emergency Manager Jerry Ambrose executed a resolution authorizing Flint to enter into Change Order No. 9, which would extend Rowe's contract as City Engineer from January 1, 2012 to June 30, 2013.

195.   In September of 2013, Rowe was re-hired by Flint for professional services for the 2014 fiscal year, wherein Rowe would continue to serve as City Engineer.

### iii.   Flint's Water Supply Is Switched to the Flint River Without the Provision of Corrosion Control

196.   In November of 2012, Flint Emergency Manager Ed Kurtz wrote to State of Michigan Treasurer Andy Dillon suggesting that Flint join the yet to be formed KWA due to projected cost savings over DWSD. This was pursuant to the Emergency Manager's mandate to cut costs.

197.   In December of 2012, during a meeting with the State of Michigan Treasury, Flint rejected the Flint River as a water source because of the comparatively high costs of preparing the FWTP to treat water drawn from the Flint River to applicable standards.

198.   In early 2013, Flint Emergency Manager Ed Kurtz signed an

agreement to switch Flint's primary drinking water source from the DWSD to the newly formed KWA, which was scheduled to become operational sometime in 2016.

199. Kurtz and other government officials proposed drawing drinking water from the Flint River until the KWA was completed.

200. In or around June 2013, Emergency Manager Kurtz hired LAN to advise the City with respect to using the Flint River as the City's water source during the construction of infrastructure for the KWA. LAN advised the City regarding the design of an upgrade to the Flint Water Plant and stated that "quality control could be addressed."

201. On June 10, 2013, LAN submitted a proposal to Flint for upgrading the FWTP entitled "Flint Water Treatment Plant Rehabilitation – Phase II." The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta, Professional Engineer (Senior Project Manager).

202. LAN claimed in its proposal that its "staff has the knowledge, expertise and the technical professionals to handle all aspects of the projects. Our staff has firsthand knowledge of the [FWTP] . . . ."

203. The proposal included the following relevant sections:

48

a.  A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply.

b.  A "Standards of Performance" section where LAN "agree[d] to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification, and ability of LAN.

204.  On or about June 26, 2013, Kurtz signed a resolution authorizing Flint to enter into a professional services contract with LAN to place the FWTP into full-time operational use, which would draw water from the Flint River as its primary source of water until the completion of the KWA.

205.  Flint formally retained LAN as the design engineer for improvements and upgrades to the FWTP for the treatment of new water sources, including both the Flint River and the KWA pipeline. In deciding to proceed with the transition to the Flint River, the City of Flint noted LAN's "extensive experience in this field," and relied upon LAN's identification of the "engineering, procurement, and construction needs" for the project. Although the City recognized that water from the Flint River "would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" of the City's water. *See* City of Flint, Water System Questions & Answers (Jan. 13, 2015), available at http://mediad.publicbroadcasting.netlp/michiganlfiles/201512/CoF-

49

Water-SystemFAQ-1-16-2015.pdf. LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services. City officials, including then-Mayor Walling, relied upon LAN's advice in pronouncing the City's water to be safe.

206.   The transition to the Flint River as a primary water source presented many well-known challenges and dangers.  Flint's water treatment plant had not been needed to treat the water received from DWSD, as DWSD provided the water in an already treated state.  It is critical that a new source of water be properly studied and treated to ensure that its use will not result in the corrosion of pipes in the delivery system. This is particularly important where portions of the delivery system, included but not limited to service lines, are made of lead. According to the EPA, "it is critical that public water systems, in conjunction with their primacy agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives.  The water obtained from the Flint River was substantially more corrosive than the treated water Flint had been receiving from DWSD.  Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources.  Flint River water is known to contain about 8 times more chloride than

Detroit water.  It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water.  Phosphates are often added to corrosive water as a method of corrosion control, to prevent metals from leaching into the water.

207.   Upon information and belief, there were no bids submitted by LAN or any other firm for this work, nor were any other firms considered for this work. The contract was awarded without competitive bidding.

208.  On June 29, 2013, LAN met with representatives of Flint, representatives of the Genesee County Drain Commissioners Office and the MDEQ to discuss:

     a.     Using the Flint River as a water source;

     b.     The ability to perform the necessary upgrades to the FWTP;

     c.     The ability to perform quality control;

     d.     The ability for Flint to provide water to Genesee County;

     e.     The ability to meet an April or May 2014 timeline; and

     f.     Developing a cost analysis.

209.   According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects . . ." of the items previously referenced, and the following determinations were made:

     a.     The Flint River would be more difficult to treat, but was viable as a source;

b. It was possible to engineer and construct the upgrades needed for the treatment process;

c. It was possible to perform quality control "with support from LAN engineering which works with several water systems around the state, quality control could be addressed[;]"

d. FWTP did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;

e. There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable; and

f. The next steps were for LAN to present Flint with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates.

210. Upgrading the FWTP would have its challenges. Since 1965, the FWTP served as a secondary and backup water supply system to the DWSD. Typically, a secondary supply for a public water system would be needed only during emergency situations, and is normally designed for short-term operation such as providing the average daily demand for only a few days.

211. Upon information and belief, the FWTP was previously upgraded in or around 2004 in order to allow it to operate for an extended short-term period (i.e., approximately 6 weeks).

212. Due to the aforementioned 2013 agreement, the FWTP needed upgrading to operate on a full-time basis, otherwise it would be unable to provide the citizens of Flint with sufficient quantities of water.

213. In April of 2014, LAN, Flint and MDEQ officials addressed and

discussed optimization for lead, and they decided that having more data was advisable before implementing an optimization method.

214.   On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi-year transition to the new KWA facility.

215.   Despite receiving these permits, the water system was not ready to become operational.

216.   The Flint water system was not prepared for the switch to Flint River water. The Flint River, it turned out, was contaminated with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The level of chlorides in the Flint River was eight times the levels provided in DWSD water. Chlorides are highly corrosive, and must be neutralized with anticorrosive agents before entering public water systems.

217.   LAN knew, if not recommended, that the FWTP would begin drawing water from the Flint River later that month that would not be treated with anti-corrosive measures.  Moreover, the potential consequences in endangering the public health as a result of not using anti-corrosive treatments when using water from the Flint River as the primary source were or should have been well-known and foreseeable to LAN, an engineering firm that, according to its website, is a "national leader in the heavy civil infrastructure engineering industry," "one of the

most respected engineering firms in the United States today," and "a recognized leader in the industry with a rich history of serving a diverse group of heavy civil infrastructure clients across the country."

218. From July of 2013 through April of 2014, LAN provided its professional services, but failed to meet its duty of care and competence. LAN was responsible for providing engineering services to make Flint's inactive water treatment plant sufficient to treat water from each of its new sources. LAN's actions facilitated the transfer of Flint's water source to river water without proper corrosion control treatment. The improvement and upgrade plans to the FWTP were approved by MDEQ in April of 2014 pursuant to plans and specifications signed and sealed by LAN. LAN, as Flint's outside contractor, had a duty to recognize the need for corrosion control and advise that it should be implemented. Yet, incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply. In fact, nothing whatsoever was being done to account for the corrosive nature of the Flint River water. Moreover, LAN did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents and property.

219. On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made.

220.   Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

221.   In the midst of growing concerns about the safety of its water, Flint engaged two engineering companies to provide their professional opinion regarding the necessary changes to render the water compliant with state and federal laws.  First, the City engaged LAN.

222.   On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria.  In response, the City issued boil water advisories on August 16, 2014 and September 5, 2014.

223.   To address the bacteria problem, the water was treated with additional chlorine.   However, as has been well known for decades, in corroded pipes, chlorine preferentially reacts with the bare metal instead of attacking solely bacteria.  The addition of substantial amounts of chlorine to a water supply was thus ineffective in treating bacteria – so more chlorine was added.

224.   The use of chlorine to disinfect water produced various disinfection byproducts,   including   trihalomethanes   (often   referred   to   as   "Total Trihalomethanes" or "TTHM").   When bare pipes are not protected with a corrosion control protocol, more chlorine yields more TTHM.

225.   Immediately after the discovery of Flint's bacterial problems, it was apparent that Flint's TTHM levels were high.  This should have been a red flag

that the steel in the pipes had been laid bare by the high salt concentrations the water pumped from the Flint River.

226.   As officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014 – the Michigan Department of Health and Human Services ("MDHHS") reported an outbreak of Legionnaires' disease – another red flag.

227.   Legionnaires' disease is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the rate rises to 80%.   Infection in humans occurs when water droplets contaminated with legionella bacteria are inhaled or when water-containing legionella enters the trachea.   Extensive studies of legionella have established that the pathogen enters the water supply when the "bio-film" protecting pipes is stripped away – which is exactly what happened when the River's corrosive water entered the City's pipes.

228.   In addition to a rise in the reported incidence of Legionnaires' disease, MDHHS first noted another potential problem related to Flint's water in September 2014 – lead poisoning rates "were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014."

229.   As early as October 1, 2014, it was known that one of the causes of the bacterial contamination was the existence of iron pipes in the City's water distribution system.

230.   Most of Flint's 550 miles of water mains are now over 75 years old and constructed of cast iron piping.  Cast iron pipe is subject to internal corrosion, called tuberculation, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage.  Tuberculation also encourages the development of biofilms, layers of bacteria that attach to the interior pipe wall.

231.   On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

### iv.    LAN Was Asked to Evaluate the Problems But Failed to Do So Properly

232.   In November of 2014, LAN was on actual notice of the need to assess the factors contributing to high TTHM levels following the water source change. LAN was engaged to evaluate this issue by Flint and provide a report of its findings, which it did in August of 2015.

233.   LAN issued a 20-page Operational Evaluation Report on November 26, 2014, intended to address compliance with EPA and MDEQ operations and regulations.  LAN entirely failed to address the hazard of lead associated with the corrosive water flowing through the pipes, at least half of which were made of lead.

*v.* ***The Water Problem Became Publicly Known***

234.   On December 31, 2014, the first round of lead monitoring showed results exceeding the Lead and Copper Rule's action levels for lead, 15 parts per billion.  Worse yet, these samples were not drawn from the highest risk homes as required by the Lead and Copper Rule.

235.   On January 2, 2015, the City of Flint mailed a notice to its water customers indicating that it was in violation of the Safe Drinking Water Act due to the presence of trihalomethanes, which was a product of attempting to disinfect the water. It was claimed that the water was safe to drink for most people with healthy immune systems.

236.   The fact that the Flint River water contained such high levels of bacteria is a product of the horrific decision not to implement corrosion control.

237.   In late 2014 or early 2015, a study by the MDHHS was published that showed a dramatic spike in elevated blood lead levels in Flint's youngest children. The testing occurred in the Third Quarter of 2014.

238.   This aforementioned spike meant that, by the Third Quarter of 2014, the percent of Flint children with known elevated blood lead level tests rose from 2.5% to about 7%.

239.   This upward spike coincided precisely with the exposure of Flint's children to the toxic water of the untreated Flint River, in their homes, schools and

other public locations.

240. That the aforementioned spike occurred at the time of the exposure to the Flint River water constituted clear and certain notice that a major health emergency confronted the children of Flint.

241. On January 9, 2015, University of Michigan-Flint water tests revealed high lead levels in two locations on campus, causing the university to turn off certain water fountains.

> ### vi. Veolia Was Hired to Evaluate and Respond to the Water Problem

242. Veolia submitted to Flint its "Response to Invitation to Bid for Water Quality Consultant", Proposal No. 15-573. Veolia proposed "to address the immediate reliability and operational needs" of Flint's water system.

243. Flint had requested engineering services:

  a. To review and evaluate "the City's water treatment process . . . and procedures to maintain and improve water quality";

  b. To develop and report with recommendations "to maintain compliance with both State of Michigan and federal agencies"; and

  c. To assist the City in implementing the recommendations.

244. In February of 2015, Veolia was hired through a resolution that incorporated a standard of performance clause, which stated that "the City is relying upon the professional reputation, experience, certification, and ability of [Veolia]."

245.   Defendant Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken.   As water treatment professionals, Veolia had an opportunity to catch what LAN and Rowe had missed or refused to warn about – corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

246.   On February 10, 2015, Veolia and the City issued a joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would be evaluating all of the City's water treatment processes.

247.   The press release contained no limitation on Veolia's scope of work. David Gadis, the Vice President of Veolia North America's Municipal & Commercial Business stated, "We understand the frustration and urgency in Flint[.]  We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint."  He continued, "We have extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water." Based on these representations, the people of Flint had every reason to rely on Veolia's subsequent representations of safety.

248.   On February 12, 2015, Rob Nicholas, Veolia's Vice President stated: "We're going to look at the numbers, we're going to look at the plant, we're going

to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

249.   Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only 6 days to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015.   Per the interim report, the only issue not in Veolia's scope of study was "why the change from [Lake Huron water via the Detroit system pipeline to Flint River water] or the history of the utility."

250.   In the interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards."   It also noted that "[s]afe [equals] compliance with state and federal standards and required testing."   Veolia effectively declared publicly that Flint's water was safe.

251.   Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe."   It noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

252.   In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water."

253.   Veolia issued its final "Water Quality Report" dated March 12, 2015.

254.   In the final report, Defendant Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

255.   The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

256.   Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant

flushing will change the flow of water and potentially cause temporary discoloration."

257.   Therefore, in addition to missing the connection between the lack of corrosion control and lead contamination, Defendant Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

258.   In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

259.   As a result of Veolia's actions, the residents of Flint, including Plaintiffs, continued to be exposed to poisonous water beyond February and March of 2015.

> ### *vii.*        *LAN and Veolia Fail to Conduct a Root Cause Analysis*

260.   Both LAN and Veolia were hired to ensure Flint's water system was protective of human health and compliant with federal and state environmental statutes. In February 2015, LAN issued its report "Trihalomethane Formation Concern," and on March 12, 2015, Veolia issued its report, "Flint Michigan Water Quality Report."   Critically absent from both reports was a root cause analysis of why the high TTHM levels existed.   A root cause analysis is the standard process used by engineers to determine the origin, case and interrelationship of events. It is

a standard practice used by environmental, health, safety and infrastructure engineers whenever an adverse event occurs. Understanding why an event occurred is critical to developing effective recommendations for dealing with an event. It is important to note that a root cause analysis would not have required invasive testing, just consideration of the facts known to date and drawing a conclusion about their interrelationship. Had such an analysis been done, the consultants would have discovered the corrosion of the pipes, and the presence of lead and legionella in the water system.

261. The causal relationship of events leading to the high TTHM levels is not complex science. It is widely known in the scientific community that:

    a. Road salt from decades of deicing contaminates northern rivers such as the Flint River;

    b. Road salt contains chloride, which is highly corrosive to steel and lead pipes and that such pipes are used throughout Michigan and Flint;

    c. Chloride strips pipes of protective surfaces which frees legionella and lead;

    d. Urban rivers contain high levels of E. coli;

> e. While chlorine is effective in treating E. coli, it becomes far less effective when bare metal has been exposed because the chlorine preferentially reacts with the metal;
>
> f. The need to add excessive chlorine is indicates that bare metal has been exposed, and that corrosion is occurring; and
>
> g. Excessive chlorination causes high TTHM levels.

262. LAN's and Veolia's failure to conduct a root cause analysis recognizing the corrosion's role in Flint's water problems is truly inexplicable because as detailed above all of these events had been highly publicized before they issued their report:

> a. The Flint River had been highly impacted by road salt for decades—the river had eight times more salt than water supplied by the DWSD;
>
> b. Lead and steel pipes are ubiquitous in the United States, Michigan and Flint;
>
> c. In the summer of 2014, Flint suffered one of the worst outbreaks of Legionnaires' disease in U.S. history;
>
> d. On October 14, 2014, GM stops using the City's water because of corrosivity.  It was reported next day in press;

e. On January 9, 2015, UM Flint shut its water fountains because lead exceed federal standards; and

f. In February 2015, if not before, lead in drinking water in other locations also exceed the standards.

263. Any of these red flags, and indeed the general knowledge in the scientific community, should have alerted LAN and Veolia to the extensive corrosion and resultant release of lead and legionella in the City's drinking water system.

264. For example, it should have been obvious to LAN and Veolia – as professed experts on water quality and treatment issues – that a small river in an urban environment, such as the Flint River, would be contaminated by chlorides from salt used in road de-icing operations during many Michigan winters.  Indeed, in February 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City completed an assessment of the Flint River as a possible source of drinking water and concluded that it had a very high susceptibility to potential contamination sources.  Moreover, a simple comparison of the chloride levels in the Flint River with that provided by the DWSD, Flint's prior water source, should have quickly alerted LAN and Veolia to potentially serious corrosion issues as the Flint River contains about eight-times more chloride than the DWSD-supplied water. The Flint River water also had an extremely high chloride-to-sulfate mass ratio ("CSMR") of

66

1.6.   Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern. Had LAN or Veolia investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately had reason to believe that Flint's CSMR posed serious corrosion risks.

265.   The City's inability to effectively treat E. coli with chlorine should have likewise alerted LAN and Veolia to the existence of corrosion.  It is well established by governmental authorities and the scientific community that the inability to treat E. coli with chlorine is often caused by heavily corroded piping. According to a study published by the U.S. EPA, high E. coli concentrations are a product of corrosion, and the inability to treat E. coli with chlorine is caused by corroded pipes.  Flint's inability to treat E. coli with moderate amounts of chlorine – and the resulting high TTHM concentrations – should have placed LAN and Veolia on notice that Flint's pipes were corroding and releasing lead and other materials into the drinking water supply.   The uptick in reported cases of Legionnaires' disease, reported during a press conference prior to LAN's and Veolia's retention, should have put LAN and Veolia on notice that Flint's water system exhibited signs of corrosion.   Legionella, the bacteria that causes Legionnaires' disease, grows on the film on the inside of pipes, which when stripped away by corrosion frees the legionella into the drinking water system.

Outbreaks of Legionnaires' disease are rare unless pipes have been stripped of their bio-film by warm, corrosive water—which is exactly what exists in the Flint River and water supply.   Yet neither LAN nor Veolia drew a connection between the outbreak and the cause of the outbreak.  Nor for that matter, did they make any recommendations to treat the water to prevent or abate an outbreak.

266.   In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply.  "Lead has been a challenge and a bane for water suppliers since historical times … The numerous articles printed in leading scientific journals, in the United Kingdom and United States, in the late nineteenth century, documenting thousands of cases of lead poisoning caused by lead water pipes, have largely faded in the mist of history. These cases often resulted in death, paralysis, blindness, insanity, convulsions, miscarriages and still births."  Dr. Colin Hayes *et al.*, Best Practice Guide on the Control of Lead in Drinking Water, Foreword (Dr. Colin Hayes ed. 2010).  As just one of hundreds of examples, a summer 2010 report by the Water Research Foundation stated:  "Lead concentrations in tap water are strongly influenced by distribution system water chemistry. In response to changes in water chemistry, high lead concentrations can also be observed in systems with no previous history of a lead problem … Solubility and dissolution rates of corrosion products are

affected by water chemistry parameters including pH, dissolved inorganic carbon, orthophosphate, and the concentration and type of disinfectant residual." These are the exact conditions that existed in Flint's water supply.

267.   Finally, just the color of Flint's water should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded.   The source of Flint's water discoloration was rust, a product of steel and lead corrosion. The presence of rust in the water should have alerted LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

### viii.        *LAN and Veolia's Conclusion's made the Situation Worse*

268.   The conditions leading to the release of lead are heavily regulated by the federal government, and indeed Veolia agreed in its scope of work with the City to determine whether such regulatory standards had been met. The federal government mandates the implementation of corrosion control protocols in order to protect the public against the possibility of lead entering the drinking water due to corroding pipes.  Concern over lead concentrations in drinking water motivated the passage of the *Lead* and Copper Rule (LCR) in 1991.  The LCR requires utilities to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L.  *See* 40 C.F.R. pt. 141, sub. E and I. Flint's own sampling analysis indicated that its system violated the LCR standards.

69

269.   Veolia, however, failed to conduct any analysis.   Nevertheless, it made the false statement in its March 12, 2015 report that its "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations."   Veolia and LAN knew or should have known that the Flint water system was in violation of federal safe drinking water standards. Veolia's statement that Flint's water system complied with the LCR prolonged the crisis to this day.

270.   Another reason for the corrosion of pipes is the drinking water's acidity. It is well known that the decay of pathogens and other organic materials such as those found in the Flint River causes water to become more acidic.

271.   It is also well known to water quality engineers that the addition of acidic water quality treatment chemicals, such as ferric chloride which is used as a coagulant to settle out particles at the water treatment plant, can further increase the water's acidity. According to the EPA, "[i]f the raw water for a utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided.   Also, since a lower pH will increase corrosion in almost all cases, a utility should consider the finished water pH goal before implementing enhanced coagulation."   U.S. EPA Office of Water, *Enhanced Coagulation and Enhanced Precipitative Softening Guidance Manual* § 6.4, (EPA 815-R-99-012, May 1999).

70

272.   Veolia should have recommended maintaining the drinking water's neutral pH by adding phosphate, but instead, in direct contradiction of federal authorities, recommended increasing the dosage of ferric chloride – a very potent, corrosive acid.  According to the Centers for Disease Control and Prevention:

> Chemical additives are added to water during the water treatment process. More than 40 chemical additives can be used to treat drinking water. Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter. . . .  These acidic water treatment additives can interfere with corrosion protection. . . . Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers.  Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home. . . . The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system. . . . The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity, alkalinity, and concentrations of calcium, magnesium, phosphates, and silicates in the water.

Centers for Disease Control and Prevention, *Fluoridation of Drinking Water and Corrosion of Pipes in Distribution Systems Fact Sheet*, http://www.cdc.gov/fluoridation/factsheets/engineering/corrosion.htm (last updated July 10, 2013).

273.   Nowhere did Veolia recommend that the City take steps to institute corrosion control to prevent lead and legionella from spreading throughout the City's water supply.   Veolia merely suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*,

but not wholly effective means for minimizing *water discoloration*.  There was no mention of the need to add corrosion control to prevent the release of lead and legionella.   Veolia's report states, "The water system *could* add a polyphosphate to the water as a way to minimize the amount of *discolored water*." (Emphasis added).    The report explains that, "Polyphosphate addition will not make *discolored water* issues go away." (Emphasis added).    Thus, rather than recognizing that corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, Veolia merely suggested adding phosphate to address water discoloration. Even Veolia's *suggested* dosage to address discoloration, 0.5 mg/L was far too low.  In February 2016, the City was adding four to eight times as much phosphate, 2 to 4 mg/L.

274.  Veolia's conclusion that no efforts needed to be undertaken to maintain the neutrality of the water supply, is presented as a scientific certainty however.  Its March 2015 report states that prior to arriving at its conclusions, Veolia undertook "laboratory testing" and concluded that, "[c]urrent ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended."  Veolia acknowledged that its recommended increase was significant:  "This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year."

275.   At the same time that Veolia gave the unqualified opinion that the current dosage is "too low," and should be doubled, Veolia knew that the City had no corrosion control protocol and knew (or should have known) that significant corrosion was already occurring. Veolia's directive that the City double its dosage of ferric chloride was unqualified and in no way warned that acidic water would increase corrosion.

276.   In August, 2015, LAN made the same recommendation to increase the dose of ferric chloride.

277.   LAN and Veolia should have told the City to *reduce* the concentration of ferric chloride, and that adding phosphate as a pH buffer was *mandatory*.   No such recommendation was made, and as a result, the lead and legionella courses through the City's water supply to this day.

278.   A graph prepared by the Flint Water Study Group from Virginia Tech University shows that the pH of Flint's water distribution system became more acidic after the Veolia Report was issued in March, even as the pH in the Flint River became less acidic:



279.   The graph above shows that the Flint River had a harmless pH at or above 8.0 for all of 2015, and steadily increased after June.  By comparison, the graph shows that the pH in Flint's municipal water supply started dropping steadily from 7.9 in March (just after Veolia made its recommendation to double the ferric chloride concentration) to 7.3 in August.  This difference is significant.  pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0  is ten times more corrosive than a pH of another whole number, such as  8.0 The drop in pH from 7.9 to 7.3 indicates a dramatic increase in the corrosivity of Flint's water.

280.   The graph above is punctuated with quotes from Defendants' emails and other documents that illustrate the contradictory information provided by State officials regarding the existence of corrosion control measures and lead in Flint's drinking water.

281.   On June 24, 2015, the U.S. EPA reached a similar conclusion about the City's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint began adding *ferric chloride*, a coagulant used to improve the removal of organic matter, as part of the strategy to reduce the TTHM levels. Studies have shown that an increase in the *chloride-to-sulfate* mass ratio in the water can adversely affect lead levels by *increasing the galvanic corrosion of lead in the plumbing network*.

Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel A. Del Toral, Regulations Manager, Ground Water and Drinking Water Branch, to Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015) (emphasis added).

282.   Both LAN and Veolia analyzed the pH in Flint's water.  Both made recommendations about the addition of chemicals that affect pH.  Both were negligent in their analysis of the pH and their recommendations.  Had the City started adding polyphosphate or otherwise controlled for corrosion, or decreased the dosage of ferric chloride, less lead and legionella would have been released into Flint's water supply.

### ix.   *Veolia and LAN Mislead the Public, Falsely Assuring Them The Water Was Safe*

283.   Not only were LAN and Veolia hired for the express purpose of determining the cause of Flint's water problems and identifying the corrective measures necessary to render Flint's water system compliant with state and federal

regulations, they were hired to give assurances to the residents that their water was, quite simply, safe to drink. LAN and Veolia complied with their mandate, and provided assurances that the water was safe to drink--when it was not.

### B. Factual Allegations Relating to Government Defendants[3]

#### i. Background On Decision to Switch Water Sources

284. Plaintiffs re-allege and incorporate by reference and make a part hereof, all previous paragraphs as though each were fully set forth herein and restated.

285. As described above, from 1964 to 2014, Flint water users received their water from Lake Huron via the Detroit Water and Sewage Department. During this 50 year span, the Flint water users enjoyed safe, clean, fresh water in their homes, businesses, schools, hospitals and other places of public services.

286. In 2009, the communities of Flint, Genesee County, Sanilac County, Lapeer County and City of Lapeer, formed the Karengnondi Water Authority ("KWA") to explore the development of a water delivery system which would draw water from Lake Huron and serve as an alternative to water delivered by the DWSD.

287. In 2011, Flint officials commissioned a study to determine if the Flint

---

[3]The term "Government Defendants" refers collectively to Defendants State of Michigan, Governor Snyder, Andy Dillon, MDEQ, MDEQ Defendants, Daniel Wyant, MDHHS, Nick Lyon, Eden Victoria Wells, M.D., Jeffery Wright and Emergency Managers.

River could be safely used by the city as a primary source of drinking water. The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011" ("2011 Report"), prepared by Defendants Rowe and LAN, provided that Flint River water and the dormant Flint Water Treatment Plant ("FWTP") could be used to supply water to the City, if millions of dollars were spent to upgrade the FWTP.[4]

288.   Use of the Flint River as a primary drinking source was rejected in 2011.

289.   In August 2012, the Governor appointed Defendant Edward Kurtz ("Kurtz") as Flint's Emergency Manager.

290.   Throughout 2012, DWSD presented to Kurtz, Genesee County Drain Commissioner Jeffrey Wright, Michigan Treasurer Andy Dillon, Flint Mayor Dayne Walling and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint needed to reject Wright's pressure to join KWA and continue to receive water from DWSD.

291.   Most, if not all, discourse about Flint joining KWA or continuing with DWSD, included Wright who consistently raised arguments designed to persuade

---

[4] See March 2016 Flint Water Advisory Task Force Final Report ("Task Force Report"), Integrated Event Timeline, p. 2, available at https://www.michigan.gov/documents/snyder/FWATF_FINAL_REPORT_21March2016_51780 5_7.pdf.

Kurtz, Dillon and the Governor that the DWSD cost studies were wrong.

292.   In late 2012, Dillon, reacting to Wright's contention that the DWSD cost studies were wrong, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJR") to assess whether it would be cost-effective for Flint to switch from water supplied by DWSD and join KWA water delivery system.

293.   In February 2013, TYJR concluded that it would be more cost-effective for Flint on both a short term and long term basis to continue to be supplied with water from DWSD.

294.   Kurtz, Wright, Dillon, Walling, and the Governor understood that the decision to join KWA would result in Flint receiving water from the Flint River Flint for at least three years, until the city could be tied to the KWA.

295.   On March 26, 2013 Busch wrote an email to Wyant, which outlined the health risks posed by switching to the Flint River as a water source.  The email stated in part that switch would "pose an increased microbial risk to public health and pose an increased risk of disinfection by-product."

296.   Later on March 26, 2013 Wyant wrote an email to Dillon, which stated, "all indications are that we are supportive of joining KWA and using Flint's water as opposed to the DWSD."

297.   On March 27, 2013, MDEQ officials, aware that Kurtz, Wright,

Walling and Dillon were pushing the Governor to approve Flint joining the KWA, acknowledged that the decision to switch the water source for Flint was not based on a scientific assessment of the suitability of the Flint River water.[5]

298.   On March 28, 2013, in an email from Dillon to Governor Rick Snyder, with copies to numerous other Treasury officials and Wyant, Dillon recommended that he authorize KWA going forward, even though the independent firm he hired to perform a cost evaluation said staying with the DWSD made the most economic sense.[6]

299.   On March 28, 2013, Michigan's new Emergency Manager Law, Public Act 436, took effect.

300.   On March 29, 2013, Kurtz enacted a resolution to join KWA, and asked Dillion to approve the resolution.

301.   On April 11, 2013, Dillon, in what is now understood to be a non-fiscal decision, authorized Kurtz to enter into a contractual relationship with KWA for the purpose of supplying water to Flint beginning in mid-year 2016, subject to getting a last best offer from DWSD.

---

[5]*Id.*, *see* Task Force Timeline.  Sygo/MDEQ e-mails with Busch re:  Flint River water source switch.  "As you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost."  Task Force Timeline at 4.
[6] Dillion stated in his March 28, 2013 email:  "Governor, based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA, I am recommending we support the City of Flint's decision to join KWA.  The City's Emergency Manager, Mayor and City Council all support this decision.  Dan Wyant likewise concurs and will confirm via email."

302.   On April 15, 2013, DWSD provided a best and final offer to the City, representing a 20% savings as compared to the KWA proposal.

303.   Governor Snyder participated in discussions between his appointed emergency Manager of Flint, Kurtz, and his appointed Emergency Manager of Detroit, Kevin Orr.  At the time Dillon authorized Kurtz to contractually bind Flint to the KWA project, the Governor and State officials knew that the Flint River would be used as an interim source.

304.   On April 16, 2013, Kurtz signed an agreement with KWA and informed Dillon that the City will join KWA.

305.   DWSD Director, Sue McCormick sent a letter to Flint on April 24, 2013 offering new DWSD rates that would save Flint over $900 million dollars.

306.   In or around June 2013, the City of Flint hired LAN to advise Flint about  the use of  the Flint River as the City's primary water source during the construction of the new KWA treatment plant, which was projected to take approximately two years.

307.   Although Flint recognized that water from the Flint River "would be more difficult to treat," the City concluded, based in part on LAN's recommendations, that the Flint River was "viable as a source" of public water.

308.   On June 26, 2013, the City of Flint entered into a Resolution to switch over to the Flint River in April of 2014, and authorized action to prepare the FWTP

80

in anticipation of using the Flint water as the primary water source.

309.   Later, the City of Flint hired LAN to place the FWTP into full-time operation using the Flint River as a primary drinking water source.

310.   LAN continued to advise Flint about its transition to Flint River water through 2015, and ultimately was paid more than $3.8 million for its services.

311.   In June 2013, Dillon Kurtz, Wright, and Walling developed an interim plan ("Interim Plan") to use the Flint River water before KWA became operational. The Interim Plan would cover 2.5 years (April 25, 2014 until approximately October 2016).

312.   Dillon, Kurtz, Wright and Walling knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source and that upgrades for the Flint WTP would cost millions.

313.   When the Governor authorized the use of the Flint River as an interim source of water for Flint, he knew that in 2011 the use of the Flint River water as a primary drinking source had been professionally evaluated and rejected as dangerous and unsafe.

314.   The Governor, in a timeline prepared by his office, confirmed that in June 2013, he knew that Flint River water would be used as an interim source of

water.[7]

315.    In May 2013, emergency Manager Kurtz announced his resignation effective July 2013.  The governor reappointed Michael Brown as Flint's Emergency Manager.

316.    In September 2013, after Emergency Manager Brown resigned, Darnell Earley was appointed by the Governor as Flint's Emergency Manager.

317.    Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that the WTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda."[8]

### ii.        Flint River Used as Flint Water Source

318.    On April 25, 2014, under the direction of Emergency Manager Earley and the MDEQ defendants, Flint water users began receiving Flint River water from their taps even though Glasgow warned that the WTP was not ready.

---

[7] "City of Flint decides to use the Flint River as a water source, per Gov. Snyder timeline."  Task Force Report at 5.

[8] Glasgow said on April 16, 2014 that " … it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible ….  I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water."  The next day, Glasgow wrote Prysby and Busch of the MDEQ, that " … I have people above me making plans to distribute water ASAP.  I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon.  If water is distributed from this plant in the next couple of weeks, it will be against my direction.  I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready.  I will reiterate this to management above me, but they seem to have their own agenda."

319. Beginning in June 2013 and continuing through April 25, 2014, the State created a dangerous public health crisis for the users of Flint tap water when it and Kurtz and Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the WTP was not ready.

320. For at least a year prior thereto, the State, particularly the MDEQ and MDHHS through employees named herein, knew that using the Flint River water was dangerous and could cause serious public health issues.[9]

321. No corrosion control was put in place prior to, or after April 25, 2014.

322. Defendants were fully aware – prior to April 25, 2014 – that the required and necessary anti-corrosive treatment was not being used during the distribution of Flint River water to Flint residents, families, and home owners, including Plaintiffs.

323. Within days after the April 25, 2014 switch, Government Defendants began receiving complaints from water users, including some or all of the Plaintiffs herein, that the water was cloudy and discolored in appearance and foul in taste and odor.

324. Within weeks after the April 25, 2014 switch, water users, including some or all of the Plaintiffs herein, were reporting to the Government Defendants

---

[9] "January 23, 2013: Mike Prysby/MDEQ emails colleague Liane Shekter Smith and others about feasibility of Flint switching to the Flint River, highlighting water quality concerns." Task Force Report at 16.

that they were experiencing hair loss, rashes, vomiting and other physical maladies.

325.   Over the course of the next eight (8) months, Flint water users continued to express their concerns about water quality in multiple ways including letters, e-mails and telephone calls to Flint officials, the media and through well publicized demonstrations on the streets of Flint.

326.   As early as May 2014, the State knew that it had indeed created a dangerous public health crisis yet failed to take any remedial steps.[10]

327.   In June 2014, citizen complaints about contaminated water continued and the State failed to do anything to address these complaints.  Many Flint water users reported that the water was making them ill.

328.   On October 2014, Flint's public health emergency was a topic of significant discussion in the Governor's office.  Valerie Brader, State Deputy Legal Counsel and Senior Policy Advisor, emails [on October 14th the] Governor's Chief of Staff Dennis Muchmore and other top aides arguing for a return to DWSD because of water quality problems.  Michael Gadola, then the governor's Legal Counsel, responds by agreeing with Brader.  Brader and Rich Baird, another senior aide to the Governor, then discuss the idea with Emergency Manager Darnell

---

[10] The Governor's office received citizen complaints and was well aware of numerous press stories about water quality problems as early as May 2014 and continuing throughout 2015." *Id* at 36.

Earley, who maintains the water quality problems can be solved and it would be cost-prohibitive to return to DWSD.[11]

329.   By October 2014, the Governor and his staff knew full well of the on-going public health threat to the people of Flint yet he did absolutely nothing to assist the desperate situation for the people of Flint.[12]

330.   On October 13, 2014, the General Motors Corporation announced that it would no longer use Flint River water in its Flint plant because of, among other things, its corrosive qualities.  Despite this clear evidence of serious and significant danger, none of the Defendants took any action to alter the course of the health crisis.[13]

331.   On January 13, 2015, Earley resigned his position as Emergency Manager and the Governor replaced him with Gerald Ambrose.

---

[11]*Id*. at 17-18.

[12] The Task Force Report was critical of the Governor's failure to answer the Flint citizen calls for help in October of 2014.  "The suggestion made by members of the Governor's executive staff in October 2014 to switch back to DWSD should have resulted, at a minimum, in a full and comprehensive review of the water situation in Flint, similar to that which accompanied the earlier decision to switch to KWA.  It was disregarded, however, because of cost considerations and repeated assurances that the water was safe.  The need to switch back to DWSD became even more apparent as water quality and safety issues continued and lead issues began to surface in 2015, notwithstanding reassurances by MDEQ."  *Id*. at 38.

[13] "GM announces it is switching from City of Flint water system to Flint Township (Lake Huron) water for its Flint Engine Operations facility until KWA connection is complete, citing corrosion concerns.  Prysby/MDEQ notes Flint water chloride levels are "easily within" public health guidelines.  Annual revenue loss of $400,000.  *Id*. at 7.

### iii.        *Lead Contamination*

332.   Most of Flint's 550 miles of water mains are over seventy-five years old and constructed of cast iron piping.  Cast iron pipe is subject to internal corrosion, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage.  This corrosion also encourages layers of bacteria to attach to the inner pipe wall.

333.   Government Defendants herein were on actual notice and/or knew that the water supplied by Detroit included corrosion control treatment chemicals which prevented the leaching of lead from lead pipes found in many of the Flint residents' water systems.

334.   Defendants herein knew that, as a consequence of the failure to use the required and necessary anti-corrosive agent in the Flint River water, Plaintiffs were being exposed to toxic levels of lead and other metals, chemicals and bacteria.

335.   In accordance with the Federal Lead and Copper Rule ("LCR"), all large public water systems, including Flint's, are required to install and maintain corrosion control treatment for lead and copper water service systems.

336.   MDEQ failed to require that Flint determine and establish water quality standards, including corrosion control treatments, in violation of the LCR.

337.   As a direct and proximate result of the failure to use corrosion control

treatment, water coming from lead and copper based water systems contained lead at unacceptably high levels.

338.   MDEQ required Flint to conduct two six-month rounds of testing for lead and copper (July-December 2014 and January-June 2015) in homes that were identified as "Tier 1" sample sites (sites with known lead plumbing and/or service lines), for the presence of lead or other heavy metals.

339.   The foregoing testing employed seriously flawed testing and notification methods, including but not limited to:

   a.   Instructing water users to pre-flush the system before drawing a water sample,

   b.   Failing to positively identify Tier 1 sample sites (sites with known lead plumbing and/or service lines),

   c.   Failing to include at least 50% Tier 1 homes in the sample study,

   d.   Failing to use the same testing sites from one test to the next (the second round of testing covered only 13 sites which had been tested in the first round,

   e.   "Cherry-picking" the sites to be tested by excluding the homes that had tested with the highest parts per billion during the first round from being re-tested in the second round), thereby rejecting without cause those homes with elevated lead   level readings, and

   f.   Failing to notify residents, including Plaintiffs, when elevated levels were found.

340.   MDEQ received the results of the first round of water sampling tests by March 2015  which revealed  lead levels in excess of the minimal action levels,

i.e. 15 parts per billion ("ppb").

341. Accordingly, MDEQ, Wyant and the MDEQ Defendants knew, and were on notice by early March 2015, at the latest, that it could not achieve two consecutive testing periods below the action level (as required by the LCR protocol) and were thus required to notify Flint to commence and pursue corrosion control treatments. MDEQ failed to immediately require Flint to commence and pursue corrosion control treatments. Contrary to water quality standards and common sense, the MDEQ, through Wyant and the MDEQ Defendants, failed to evaluate the quality of the "treated" Flint River water as it came out of the consumers' tap before substituting high quality Detroit water with questionable quality Flint River water.

342. Indeed, according to a December 23, 2015 State Auditor General Report (the "2015 Auditor's Report"), the MDEQ was testing Flint River quality since 2006 at the FWTP, but never tested "treated" Flint River water quality as it came out of the consumers' taps.

343. Corrosion control chemicals should have been used immediately, as corroborated by the 2015 Auditor's Report, which expressly criticized the MDEQ because it did not confer with, or obtain the approval of the EPA when it decided to delay the use of corrosion control chemicals until after the two rounds of monitoring tests.

344.   The cost of the corrosion control chemicals would have been less than $100 per day.

345.   A November 2015 MDHHS report on the Blood Lead Level Test Results for children six years and younger living in Flint Zip Codes 48501-48507, showed  a significant and dangerous spike in the blood lead levels during the second and third quarter of 2014.

346.   From their agency's own data, MDHHS, Wells and Lyon knew by late 2014 or early 2015 that there was a dramatic increase in elevated blood lead levels in Flint children, yet failed to report this information and failed to notify the public, and in so doing intentionally concealed critical public health information for more than ten months.

347.   MDHHS was aware that the source of the elevated blood lead levels was the Flint River, and that the spike in Legionnaires' disease correlated with the introduction of corrosive Flint River water into the Flint water distribution system. In the months during which Flint distributed water from the Flint River, there was mounting and irrefutable evidence that the Flint River water was not only unfit for human consumption but was actually harming users, including causing the lead poisoning of Flint's children.

348.   Thus, by the end of 2014, at the latest, the only reasonable response to the mounting complaints and alarming data was to reconnect the Flint water

system to the Detroit water system.

349.    Instead, Government Defendants herein deliberately ignored the protests, exercised deliberate and dangerous denial, offered ineffective solutions and continued to falsely reassure residents of Flint and insist that the water was safe. This, despite the knowledge that the foul taste, odor and appearance was attributable to the highly corrosive Flint River water, untreated with the proper anti-corrosive agents, which caused particulate lead, legionella bacterial and other toxins to contaminate and befoul the water.

350.    Notwithstanding that these conditions constituted a health emergency, MDHHS failed to report and notify this public health crisis to the MDEQ, the Governor's Office, the EPA or the public and, in fact, intentionally concealed it.

### iv.        Other Toxins

351.    In the summer of 2014, reported incidents of legionnaires' disease were on the rise in the Flint area, ultimately resulting in 10 deaths in 18 months.

352.    Legionnaires' disease is associated with biofilms and corrosion in piping systems, and water with a pH range of 5.0 to 8.5, conditions which were all present in the Flint water supply. In addition to lead, Defendants' conduct also caused other harmful toxins to enter Plaintiffs' water supply.

353.    By October 2014, the increased threat of deadly legionnaires' disease

was adding to the public health safety crisis.[14]

354.   On October 21, 2014, the MDHHS was notified of the health crisis

caused by the Flint River water.  No action was taken.[15]

355.   In August of 2014, Flint's water tested above legal limits for total

coliform and E. Coli bacteria.

356.   In September 2014, Flint again violated the National Primary

Drinking Water Regulations Maximum Contaminate Level ("MCL") for total

coliform and E. Coli bacteria.

357.   In response, Flint issued boil water advisories on August 16, 2014 and

September 5, 2014 and treated the bacterial contamination with additional chlorine.

358.   Defendants had knowledge that adding chlorine to water in corroded

pipes was an ineffective treatment for bacteria because it preferentially reacts with

the bare metal, stripping away the pipes' protective coating, notwithstanding this

knowledge, and that the initial chlorine treatments were ineffective at treating

bacteria, more chlorine was added causing additional damage by creating high

levels of TTHM.

359.   After seven months of exposure to elevated TTHM levels, in January

---

[14] Task Force timeline at 7.

[15] "Susan Bohm/MDHHS e-mails GCHD officials re:  Shekter Smith's concern that Flint water would be publicly linked to Legionellosis outbreak in Flint.'  I told her the Flint water was at this point just a hypothesis.'"  *Id*. at 7.

2015, Flint water users belatedly received a notice stating that the water was not in compliance with the Federal Safe Drinking Water Act due to unlawful levels of TTHMs.

360. In January 2015, within a few weeks of the issuance of the TTHM notice, Flint City Council members and Flint citizens, outraged over the poor water quality approached Emergency Manager Earley, and demanded that Flint reconnect with Detroit water. Earley refused.

361. In January 2015, officials from MDEQ and MDHHS, including Lyon, met to discuss the ongoing threat to public health posed by the legionella bacteria in the Flint River water.[16] The public health crisis was not addressed in any serious and/or non-frivolous way.

362. On January 21, 2015, MDEQ Defendants ordered water coolers to be installed in State buildings operating in Flint. MDEQ Defendants were concerned that this action, if it became widely known by the public, would reveal their dishonesty because they had been advising the residents of Flint that it was safe to drink the tap water and at the same time arranging for alternative water sources for

---

[16] "January 2015 (date unclear): Staff from Genesee County hospitals, MDHHS, MDEQ and GCHD meet, and MDHHS Director Nick Lyon directs GCHD to conduct and complete its evaluation of the causes of the increased legionellosis cases that had begun to occur in 2014." *Id*. at 18.

the State employees who were working in Flint.[17]

### v.        *Response to Contamination*

363.   By January of 2015, representatives of DWSD expressed renewed interest in re-establishing a relationship with Flint and offered to waive the $4 million re-connect fee.

364.   Government Defendants knew or should have known that DWSD water was the only source of safe, clean water available to Flint, but, acting in concert, rejected this initiative, and deliberately continued to mislead Flint residents to believe that their water was safe.

365.   On or about January 29, 2015, DWSD offered Flint another opportunity to use Detroit water and protect Plaintiffs from known dangers of the toxic water.

366.   Notwithstanding DWSD's overture, Flint, counseled by Defendants, again rejected this offer, and Defendants deliberately continued to mislead Flint residents to believe that their water was safe.

367.   The Governor's Office was aware of the DWSD offer, and the savings it would provide Flint.  Earley rejected the offer.

368.   On or about January 29, 2015, DWSD offered Emergency Manager

---

[17] "MDEQ staff (Prysby, Shekter Smith, Benzie, numerous others) communicate via e-mail re: decision to provide water coolers at Flint's State Office building.  Some discussion re:  how this decision will affect Flint residents' perceptions of drinking water safety, and how the decision will "make it more difficult … for ODWMA staff."  *Id.* at 8.

Ambrose another opportunity to use Detroit water and protect Plaintiffs from known dangers of the toxic water.

369.    Ambrose rejected this offer.

370.    On January 29, 2015, Government Defendants acknowledged that the public health crisis was caused by the corrosion of the entire infrastructure of the Flint water system.  No action was taken to warn the public of the health crisis or to correct the harm caused by the State's decision to switch from DWSD water to Flint River water.[18]

371.    By the end of January 2015, the Governor's office was fully aware of the public health emergency cause by the rise in legionella bacteria found in the Flint River and launched a cover-up of the public health crisis, having been advised in writing.[19]

372.    On February 1, 2015, the Governor was fully briefed on the health crisis in Flint.  Given the months of complaints from Flint water users that the water was discolored, foul smelling/tasting and making them visibly sick, the

---

[18] "Sygo and Shekter-Smith/MDEQ e-mail re:  Flint water quality problems.  Shekter-Smith identifies the problem as corrosion across the distribution system rather than a 'premise plumbing' issue. Task Force Timeline at 8.

[19] "January 30, 2015:  Brad Wurfel/MDEQ e-mails Dave Murray, Governor Snyder's deputy press secretary, re:  Legionella, saying he didn't want MDEQ Director Wyant "to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of Legionellosis in Genesee County since last May."  Task Force Report at 18.

Governor knew that there was an imminent threat to the people of Flint.[20]

373.   Yet, neither the Governor, nor State and local public officials, took corrective action.

374.   On February 17, 2015, Flint water users staged public demonstrations demanding that Flint re-connect with DWSD.  Once again Ambrose refused to restore Detroit water for Flint water users.  State and local public officials falsely insisted that the water was acceptable for use and took no action.

375.   In January 2015, Flint home owner, LeeAnn Walters called the EPA regarding water issues that she was experiencing at her Flint home.  She informed the EPA that she and her family members were becoming physically ill from exposure to the Flint River water coming from her tap.

376.   On February 26, 2015, Jennifer Crooks of the EPA wrote an email to MDEQ and EPA representatives.  Crooks noted that Walters complained of "black sediment in her water."  She noted that the iron contamination was so high that the testing instruments could not measure it."[21]

---

[20] "Briefing memo is prepared for Gov. Snyder on Flint water situation, including info on residents' complaints about water quality, Mayor Walling's call for assistance, and MDEQ 'backgrounder' downplaying health risks."  Wurfel:  "It's not like an imminent threat to public health."  Task Force timeline at 9.

[21] Crooks said in her email:  "But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper.  WOW!!!!  Did he find the LEAD!  **104 ppb**.  She has 2 children under the age of 3 … Big worries here … I think Lead is a good indication that other contaminants are also present in the tap water that obviously were not present in the compliance samples taken at the plant … We also talked about Dr. Joan Rose from

377.   In a second email on February 26, 2015, Crooks stated that Miguel Del Toral ("Del Toral") of the EPA is of the opinion that the "black sediment" in the Walters water was actually lead.[22]

378.   On February 27, 2015, Defendant Busch advised Del Toral that the City was using corrosion control.  Busch knew, at the time he made this statement to the EPA, that it was false.[23]

379.   On March 5, 2015, the Governor and officials in the Governor's office realized that they had a massive public health emergency which *probably included widespread lead poisoning* on their hands and began discussing distributing water filters to Flint water users.  These public officials took no action to warn or otherwise protect Plaintiffs, and continued to conceal from them and the public the true nature, extent and severity of the public health crisis.[24]

380.   By March 10, 2015, James Henry of the GCHD raised concerns that

---

Michigan State being on the Flint Tech Advisory committee – would want to dive further into this … she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps."

[22] Crooks stated that "Miguel is wondering if Flint is feeding Phosphates.  Flint must have Optimal Corrosion Control Treatment – is it phosphates?  From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area?  Or are they more widespread?"

[23] "Busch/MDEQ responds to Del Toral/EPA saying that the City of Flint 'Has an Optimized Corrosion Control Program,' LeeAnn Walters's house is 'not part of the City's established sample site pool' and the residence has PVC plumbing."  Task Force Timeline at 10.

[24] "Officials in Governor's Office and MDEQ begin discussing providing water filters to Flint citizens."  *Id.*

he was being stonewalled by the State in accessing public health information about the legionella outbreak in Genesee County. The concealment of the public health emergency by Government Defendants was shocking and unconscionable.

381.   As of March 10, 2015, Defendants knew that the extreme public health emergency involved lead poisoning, deadly legionella bacteria and a host of other ailments.[25]

382.   On March 25, 2015, Flint City Council voted to re-connect to Detroit's water system. Ambrose, exacerbated the State-created danger by rejecting this vote of the Flint public officials.[26]

---

[25] "James Henry/GCHD e-mails Howard Croft/Flint DPW, Prysby/MDEQ, Mayor Walling and others citing the city's and state's lack of cooperation and failure to respond to his requests for information – and a Jan. 2015 FOIA – to support county's investigation of potential causes of Legionellosis outbreak in Flint. 'This is rather glaring information and it needs to be looked into now, prior to the warmer summer months when legionella is at its peal and we are potentially faced with a crisis.'" Exhibit B, Task Force Timeline at 9. The Task Force Report highlights the government misconduct which prolonged the danger created by the State when it decided to use the highly corrosive Flint River water. The Task Force stated in its report that "[a]s the Flint water crisis unfolded, certain state agencies' perceived need to defend the original decision to switch to the Flint River and resist a return to DWSD resulted in public relations and communications efforts that have, at times, been inappropriate. In the spring and summer of 2015, for example, this perceived need to defend a flawed decision manifested itself in attempts by MDEQ and MDHHS to discredit accurate information on lead in drinking water and elevated blood lead levels provided by outside experts. Citizen concerns were at times derided and dismissed, in spite of the fact that various members of the Governor's staff had expressed – and were expressing – concerns about the water situation in Flint at the same time." ….**In any event, the facts in this case point to the reality that state government, as the entity in charge of Flint decision-making, failed to protect the health of the city's residents**. Task Force Report at 37, 40 (Emphasis added.).

[26] The Task Force further notes that in March, 2015, Emergency Manager Ambrose completely ignored numerous alarms and warnings that the Flint River water was dangerous to the health of the Flint water users. "Flint City council votes 7 – 1 to end Flint River service and return to Detroit water service; the vote is non-binding since Flint is under EM control. Flint EM

383.   On or about May 6, 2015, employees from EPA Region 5 arrived in Flint and began sampling the water for elevated lead levels. The EPA samples disclosed dangerously and alarmingly high lead levels in excess of 15 ppb, indeed as high as 13,500 ppb, a level twice what is required for classification as hazardous waste.

384.   On June 24, 2015, Del Toral of the EPA prepared a memorandum entitled, "High Lead Levels in Flint Michigan-Interim Report" ("Del Toral Report").  On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

> "I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed."

385.   Del Toral further warned that the failure to inform Flint water users of the elevated lead levels was "bordering on criminal neglect."

386.   The Del Toral Report was shared with, among others, MDEQ's Chief of Office of Drinking Water and Municipal Assistance, Liane Shekter-Smith, MDEQ's Water Treatment Specialist, Patrick Cook, MDEQ's District Supervisor, Stephen Busch, and MDEQ's Engineer assigned to District 11 (Genesee County), and Michael Prysby.

---

Ambrose:  'It is incomprehensible to me that … Flint City Council would want to send more than $12 Million a year to a system serving Southeast Michigan, even if Flint rate payers could afford it.  (Lake Huron) water from Detroit is no safer than water from Flint.'"  Task Force Timeline at 10.

387.   Nonetheless, MDEQ failed to undertake any measures to effectively address any of the dangers, including lead poisoning, identified by EPA Agent Del Toral.

388.   On July 10, 2015, MDEQ official Brad Wurfel, in an effort to conceal the public health crisis, appeared on public radio and advised listeners that Flint water was safe and that it was not causing "any broad problem" with lead leaching into residential water.  Parents, worried about the lead poisoning of their children demanded answers from Wurfel.  He told the concerned parents, "[*l*]*et me start here-anyone who is concerned about lead in the drinking water can relax*."  Wurfel, at the time he made this statement, knew his statements were false and he deliberately misled the public about the seriousness of the crisis.

389.   By July 2015, multiple agencies within the State of Michigan, including the Governor, the Governor's Office and MDEQ, had actual notice of high lead exposure and other dangers, including legionnaires' disease, associated with Flint water.

390.   On July 22, 2015, Governor Snyder's Chief of Staff, Dennis Muchmore, wrote to MDHHS Director Lyon and stated that Flint residents' concerns regarding lead poisoning and other dangers were being "blown off" by the Government Defendants.

391.   On July 24, 2015, Wurfel continued to promote the cover-up of the

health crisis. In response to the recognition that the Government Defendants were blatantly ignoring the concerns of Flint residents, he stated, "In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper."

392. In August 2015, Professor Marc Edwards of Virginia Tech determined that there was serious lead contamination of the Flint water system and stated that the people of Flint face a major public health emergency.

393. Professor Edwards also determined that the Flint River water was 19 times more corrosive than the water pumped from Lake Huron by the Detroit water system and that without corrosion control treatment, lead was leaching out from the lead based service lines at alarming rates.

394. On or about September 2, 2015, Professor Edwards published the results of his studies described above.

395. Wurfel immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

396. The increase in elevated blood lead levels in Flint's children, and

Wells' failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency.  Wells, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the Flint community.  Her concealment of this critical information increased the risk and exacerbated the danger.[27]

397.  Almost immediately following Edwards studies, widespread public demands to re-connect Flint to the Detroit water system were made to the Government Defendants from, among others, the following national, regional and local public interest groups:

    a.  The ACLU of Michigan,

    b.  The Natural Resources Defense Council,

    c.  The Michigan Chapter of the National Conference of Black Lawyers,

    d.  The Michigan/Detroit Chapter of the National Lawyers Guild,

---

[27] The Task Force Report states that in July, 2015, the MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of the Flint River water as a drinking water source for Flint water users.  The MDEQ knew its public statement in September about no elevated blood lead levels was false.  ("July 28, 2015:  MDHHS epidemiologist Cristin Larder finds that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation."  On the same day, CLPPP data manager Robert Scott analyzes the data over a 5-year period and concludes that "water was not a major factor."  Later that day, CLPPP manager Nancy Peeler concludes that the lack of persistently elevated blood lead levels in children in Flint beyond the summer months indicates no connection to the change in water in Flint in 2014.  Larder then receives email communication from Peeler:  Peeler has concluded from CLPPP data and communicated with MDHHS leadership that there is no problem with children's lead levels in Flint."  Task Force Report at 20.

e.  The NAACP-Michigan State Conference,

f.  The Michigan Nurses Association,

g.  The Democracy Defense League Water Task Force,

h.  Water You Fighting For,

i.  Concerned Pastors for Social Action, and

j.  Coalition for Clean Water and other similar public interest groups.

398.   Wurfel, speaking for the State, immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

399.   By late 2014 or early 2015, Lyon was aware from MDHHS data that there was a dramatic increase in the percentage of Flint children with elevated blood lead level readings from blood drawn during the second and third quarters of 2014, and that Legionnaires' disease was on the rise during the same period of time.  Lyon was aware of this dangerous condition but did nothing to report the findings to the Plaintiffs or the public.

400.   Lyon knew that these elevated blood lead levels, and an increase of Legionnaires' disease found in its own database, correlated with the introduction of

the corrosive Flint River water into the Flint water distribution system.  Lyon did not order that any action be taken to warn the public.

401.   The increase in elevated blood lead levels in Flint's children, and Lyon's failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency.  Lyon, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the Flint community.  His concealment of this critical information increased the risk and exacerbated the danger.[28]

402.   Dr. Mona Hanna-Attisha, in the summer of 2015, using data available to her from Hurley Hospital, observed a similar spike in the percentage of Flint children with elevated blood lead levels from blood drawn in the second and third quarter of 2014.  She published her study in an effort to alert the community about the health risks associated with drinking Flint River water.

---

[28] The Task Force Report states that in July, 2015, the MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of the Flint River water as a drinking water source for Flint water users.  The MDEQ knew its public statement in September about no elevated blood lead levels was false.  ("July 28, 2015:  MDHHS epidemiologist Cristin Larder finds that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation."  On the same day, CLPPP data manager Robert Scott analyzes the data over a 5-year period and concludes that "water was not a major factor."  Later that day, CLPPP manager Nancy Peeler concludes that the lack of persistently elevated blood lead levels in children in Flint beyond the summer months indicates no connection to the change in water in Flint in 2014.  Larder then receives email communication from Peeler:  Peeler has concluded from CLPPP data and communicated with MDHHS leadership that there is no problem with children's lead levels in Flint."  Task Force Report at 20.

403.   The MDEQ and the MDHHS immediately accused Dr. Hanna-Attisha of providing false information to the public.

404.   In September 2015, the MDEQ continued to falsely assure the public that use of Flint Water was safe and continued to deny the public health crisis at hand.

405.   An example of this type of misleading public statement is found in a MDEQ document entitled, "*DEQ Frequently Asked Questions, Water Lead Levels in the City of Flint, September 2015*" which stated:  "**Are there other ways the city monitors for lead exposure**?  The County Health Departments, overseen statewide by the Michigan Department of Health and Human Services, *regularly monitors blood levels* in children throughout Michigan communities.  The *leading cause of lead poisoning is exposure to lead paint*.  Blood lead level testing results for the 12-month period just after the City of Flint changed its water source (May 2014 – April 2015) *showed no significant change* in the patter of blood lead levels in Flint, compared to the previous three years.  This data *suggests the recent change in water source by the City of Flint has not contributed to an increase in lead exposure* throughout the community."

406.   On September 25, 2015, Wurfel falsely advised media and the public that MDHHS officials have re-examined its blood lead level data and the MDHHS statistics do not show the same upward trend documented by Dr. Hanna-Attisha.

104

407.   On September 28, 2015, Wurfel stated publically that the Flint water crisis was becoming "near-hysteria" because of Dr. Hanna-Attisha's report.  He said that he wouldn't call her reports "…irresponsible.  I would call them unfortunate."  Wurfel finished his remarks that day by falsely stating that "Flint's drinking water is safe in that it's meeting state and federal standards."

408.   On September 29, 2015, Wurfel referred to EPA Del Toral as a "rogue employee."

409.   By late September 2015, reconnecting to the Detroit water system was the only reasonable option to protect the health and safety of the Flint water users.  Yet the state deliberately chose not to do so.  Instead, on or about October 2, 2015, State officials announced that the State would appoint a Flint Water Advisory Task Force and would provide water filters designed to eliminate the lead in the water to Flint water users.

410.   On October 8, 2015, the Governor recognized that he could no longer pretend and perpetrate the myth that the water from the Flint River was safe.  He finally ordered Flint to re-connect with the Detroit water system which contained corrosion control chemicals.

411.   As of or about October 8, 2015, Flint's Eisenhower and Freeman Elementary Schools, along with Brownell/Holmes STEM Academies exceeded 15 ppb for lead -- the safety standard set by the federal government. Students and

105

staff were ordered to drink bottled water only.

412.   The re-connect to DWSD took place on or about October 16, 2015.

413.   On or about December 29, 2015, a special Task Force assigned by Governor Snyder ("Governor's Task Force") issued its preliminary report which concluded, among other things, that:

    a.    "…we are particularly concerned by recent revelations of MDHSS's apparent early knowledge of yet, silence about, elevated blood lead levels detected among Flint's children."

    b.    "The City of Flint's water customers-fellow Michigan citizens-were needlessly and tragically exposed to toxic levels of lead through their drinking supply."

    c.    "The Flint water crisis never should have happened."

    d.    "We believe the primary responsibility for what happened in Flint rests with the Michigan Department of Environmental Quality(MDEQ). Although many individuals and entities at state and local levels contributed to creating and prolonging the problem, MDEQ is the government agency that has responsibility to ensure safe drinking water in Michigan.  It failed in that responsibility and must be held accountable for that failure."

    e.    "The Federal Lead and Copper Rule (LCR) is central to what happened in Flint, because that rule, at least theoretically to the Flint River is designed to prevent lead and copper contamination of drinking water.  The federal LCR calls for 'optimized corrosion control treatment,' which the MDEQ did not require in the switch to Flint River….The decision not to require [corrosion control treatment], made at the direction of MDEQ, led directly to the contamination of the Flint water system."

    f.    "Throughout 2015, as the public raised concerns and as

independent studies and testing were conducted and brought to the attention of MDEQ, the agency's response was often one of aggressive dismissal, belittlement, and attempts to discredit these efforts and the individuals involved….the MDEQ seems to have been more determined to discredit the work of others-who ultimately proved to be right-than to pursue its own oversight responsibility."

414.   On or about December, 29, 2015, Wyant resigned as Director of MDEQ and Wurfel resigned as its Communications Director.

415.   Mayor Karen Weaver declared a State of Emergency on December 14, 2015.  On January 4, 2016, the Genesee County Commissioners declared a State of Emergency.  On January 5, 2016, Governor Snyder declared a State of Emergency.  On January 13, 2016, the Governor activated the Michigan National Guard to assist the people of Flint.  On January 14, 2016, the Governor asked President Barak Obama and the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") to declare Flint a Major Disaster.  On January 16, 2016, FEMA issued an emergency declaration to assist the people of Flint.

416.   The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis.  The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

417.   The public health crisis was first confirmed by the Genesee County Health Department and the City of Flint on September 25, 2015, when they issued a lead advisory warning city residents about high levels of lead in Flint water. Governor Snyder belatedly and publicly recognized that Flint residents were potentially exposed to unsafe levels of lead in October 2015.  Once the crisis became public, the value and marketability of property within the City of Flint was immediately and significantly impaired.  Lenders became hesitant to authorize loans for purchase of realty within the City and property values plummeted.

418.   On April 20, 2016, Attorney General Bill Schuette filed criminal charges against Defendants Busch and Prysby in Genesee County.  Criminal charges included criminal common law claims of misconduct in office, conspiracy tampering with evidence and willful neglect of duty, as well as charges for violation of the Michigan Safe Water Drinking Act.

419.   In subsequent testimony before the United States House Oversight Committee in March of 2016, Governor Snyder testified:

    a.  From the day the City of Flint began using the Flint River as an interim water supply on April 25, 2014 – and repeatedly after that – the state Department of Environmental Quality assured us that Flint's water was safe.

    b.  It wasn't.  A water expert at the federal EPA tried to raise an alarm in February 2015, and he was silenced.

    c.  It was on October 1, 2015, that I learned that our state experts were wrong.  Flint's water had dangerous levels of lead.

108

420.    Irrespective of when he first learned of the issue, which Plaintiffs contest, Governor Snyder's testimony establishes that the Michigan Department of Environmental Quality had fraudulently misinformed the citizens of Flint about the dangerousness of drinking Flint water. The Government Defendants did not tell the truth to the citizens of Flint until October of 2015.

Plaintiffs justifiably relied upon the false representations from Defendants that the water was safe and appropriate for use, to their detriment.

## C. Factual Allegations Relating to Plaintiffs' Harms and Damages

421.    During the relevant time period, Plaintiffs were unaware of the toxicity and contamination of the water supply they regularly used for drinking, cooking, washing, bathing, showering, dish and clothes washing, which contamination resulted from Defendants conduct and failure to act to protect the community.

422.    As a proximate result of Defendants' conduct, as set forth herein, Plaintiffs have experienced serious physical and emotional injury and severe and persistent pain and suffering due to their exposure to the toxic water, all currently and into the indefinite future.

423.    Plaintiffs have also sustained property damage including irreparably damaged service line pipes as well as substantial loss in the value of their properties.

424.   As a proximate result of Defendants' deliberate indifference, as set forth herein, Plaintiffs have experienced a seriously diminished quality of life, as well as loss of use and enjoyment of their property, and incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

## V.   CAUSES OF ACTION

### COUNT I:   GROSS NEGLIGENCE
### Plaintiffs v. MDEQ Defendants

425.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

426.   MDEQ Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint, namely the provision of safe drinking water.

427.   Plaintiffs relied on MDEQ Defendants to perform the duty to provide Plaintiffs with safe drinking water.

428.   Plaintiffs relied on the MDEQ Defendants to perform the duty to disclose known hazards in their drinking water.

429.   MDEQ Defendants owed Plaintiffs a duty to exercise reasonable care.

430.   MDEQ Defendants breached their duties to Plaintiffs, and failed to exercise reasonable care in ways including but not limited to:

a.   Failing to require corrosion control treatment of Flint River

110

water,

b.    Failing to conduct proper testing of Flint's water,

c.    Failing to require proper testing of Flint's water,

d.    Failing to respond to evidence that Flint's water was improperly treated,

e.    Misrepresenting that corrosion control treatment had been implemented,

f.    Publically declaring unsafe water to be safe to drink and use,

g.    Ignoring evidence that Flint's water was unsafe to drink,

h.    Withholding information clearly demonstrating that Flint's water was unsafe  to drink and use,

i.    Publically discrediting those who claimed that Flint's water may not be safe to drink and use,

j.    Failing to warn Plaintiffs, and the public that Flint's water was not safe to drink.

431.   Despite this knowledge, MDEQ Defendants deliberately and willfully failed to take any action to prevent or ameliorate the harm, including but not limited to the institution of any corrosion control.

432.   MDEQ Defendants' conduct was so reckless that it demonstrates a substantial lack of concern for whether injuries would result..

111

433.   MDEQ Defendants' conduct was the proximate cause of injuries suffered by Plaintiffs.

434.   Therefore, MDEQ Defendants are liable to Plaintiffs for all harms resulting to them and their property from MDEQ Defendants' conduct.

435.   MDEQ Defendants' liability includes, without limitation, personal injuries, exposure to toxic substances, and property damage suffered by Plaintiffs as a result of MDEQ Defendants' conduct.

436.   As the direct and proximate result of the MDEQ Defendants' conduct and/or  failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems, physical pain and suffering, loss of quality of life,  unreasonable interference with all aspects of daily living, quality of life and the use and enjoyment of the property, mental anguish, emotional distress,   humiliation, medical expenses, and property damages, including but not limited to damaged plumbing and lost real property value, stigma, as well as punitive and/or exemplary damages.

437.   Accordingly, Plaintiffs demand judgment against these Defendants in the amounts to which they are found to be entitled.

### COUNT II:  PROFESSIONAL NEGLIGENCE/NEGLIGENCE
### Plaintiffs v. Private Engineering Defendants

438.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

439.   Defendants Veolia, LAN and Rowe ("Private Engineering Defendants") undertook, for consideration, to render services for the City of Flint which each should have recognized as necessary for the protection of Plaintiffs, and their property, and reasonably could and should have foreseen that the failure to exercise ordinary care and the failure to satisfy the standard of reasonable engineering professionals in performing those services would endanger Plaintiffs and their property.

440.   Private Engineering Defendants owed Plaintiffs a duty to exercise ordinary care in order to avoid harm to persons and property in the execution of their undertakings.

441.   As professional engineers, Private Engineering Defendants owed Plaintiffs duties to act as engineers of ordinary learning, judgment, or skill would.

442.   Plaintiffs relied on Veolia to perform the duty to inspect the City's water supply to ensure that it was safe.

443.   Veolia failed to undertake reasonable care and conduct as a professional engineering firm.

444.   Veolia failed to exercise reasonable care in inspecting the City's water  system and issuing its interim and final reports.

445.   Veolia failed to exercise reasonable care when it declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

113

446. Veolia failed to exercise reasonable care when it represented that Flint's drinking water was safe.

447. Veolia failed to exercise reasonable care when it discounted the possibility that problems with Flint's water supply were causing harms.

448. Veolia failed to exercise reasonable care when it failed to warn about the dangers of lead leaching into Flint's water system.

449. Veolia failed to exercise reasonable care when it did not recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply.

450. Plaintiffs relied on LAN and Rowe to perform the duty to ensure proper treatment of the new water source(s).

451. LAN and Rowe failed to exercise reasonable care and conduct as professional engineering firms.

452. LAN and Rowe failed to exercise reasonable care in preparing for and executing the transition from treated DWSD water to untreated Flint River water.

453. LAN and Rowe failed to exercise reasonable care when they failed to implement corrosion control in a system containing lead pipes that was being transitioned onto a highly corrosive water source.

454.   Under the same or similar circumstances, a professional engineering firm of ordinary learning, judgment or skill would not engage in the Engineering Defendants' above-described conduct.

455.   Private Engineering Defendants' failures to exercise ordinary, reasonable care and failures to satisfy the standards of reasonable engineering professionals proximately caused Plaintiffs' injuries and harms, which were entirely foreseeable.

456.   Private Engineering Defendants are liable to Plaintiffs for all harms to their persons and property from Private Engineering Defendants' failures to exercise reasonable care.

457.   Private Engineering Defendants' liability extends, without limitation, to personal injuries, illnesses, exposure to toxic substances, and property damage suffered by Plaintiffs as a result of the Engineering Defendants' failures to exercise reasonable care.

458.   As a direct and proximate result of Private Engineering Defendants' actions and/or omissions, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems, physical pain and suffering, loss of quality of life,  unreasonable interference with all aspects of daily living, quality of life and the use and enjoyment of the property, mental anguish, emotional distress,  humiliation, medical expenses,  and property damages,

including but not limited to damaged plumbing and lost real property value,

stigma, as well as punitive and/or exemplary damages.

## COUNT III: PRIVATE NUISANCE
### Plaintiffs v. MDEQ and Private Engineering Defendants

459.   Plaintiffs have rights and privileges with respect to the use and

enjoyment of their property.

460.   The unreasonable and/or negligent and reckless conduct of Private

Engineering Defendants created a private nuisance as it caused foul water polluted

with lead and other toxins to invade Plaintiff's homes, which resulted in Plaintiffs'

exposure to contaminated water, and caused significant harm to Plaintiffs' persons

and properties.

461.   The intentional and/or grossly negligent conduct of the MDEQ

Defendants created a private nuisance as it caused foul water polluted with lead

and other toxins to invade Plaintiff's homes, which resulted in Plaintiffs' exposure

to contaminated water, and caused significant harm to Plaintiffs' persons and

properties.

462.   MDEQ and Private Engineering Defendants' conduct was so reckless

that it demonstrates a substantial lack of concern for whether injuries would result.

463.   MDEQ and Private Engineering Defendants' actions and omissions

substantially and unreasonably   interfered   with Plaintiffs' ability to use and enjoy

their homes, interfered with their quality of life and all aspects of daily living, causing significant inconvenience and expense, constituting a nuisance.

464.   Plaintiffs did not consent to having foul, water contaminated with lead and other toxins physically invade their persons or property.

465.   MDEQ and Private Engineering Defendants' actions legally caused lead contaminated water to invade Plaintiffs' homes.

466.   MDEQ and Private Engineering Defendants' conduct was the cause of Plaintiffs' injuries and damage to their persons and/or properties, including Plaintiffs' inability to avail themselves of their property's value as an asset, or as a source of collateral for financing and other purposes.

467.   MDEQ and Private Engineering Defendants are liable for all damages arising from such nuisance, including compensatory and exemplary relief.

468.   As a direct and proximate result of the above- named Defendants' conduct and/or  failures to act, Plaintiffs have suffered past, present and future personal injuries and property damage, including but not limited to: health problems, physical pain and suffering, loss of quality of life,  unreasonable interference with all aspects of daily living, quality of life and the use and enjoyment of the property, mental anguish, emotional distress,  humiliation, medical expenses,  and property damages, including but not limited to damaged

plumbing and lost real property value, stigma as well as punitive and/or exemplary damages.

## COUNT IV: PUBLIC NUISANCE
### Plaintiffs v. MDEQ and Private Engineering Defendants

469. Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

470. Private Engineering Defendants' conduct unreasonably interfered with common rights enjoyed by the general public, specifically common rights and privileges with respect to the use and enjoyment of property, and access to safe, potable drinking water.

471. The intentional and/or grossly negligent conduct of the MDEQ Defendants unreasonably interfered with common rights enjoyed by the general public, specifically common rights and privileges with respect to the use and enjoyment of property, and access to safe, potable drinking water.

472. MDEQ and Private Engineering Defendants' conduct caused foul water polluted with lead and other toxins to invade the Flint public water supply, which significantly interfered with the public's health, safety, peace, comfort, and convenience.

473. MDEQ Defendants' conduct is proscribed by Federal and State safe drinking water laws.

474.   MDEQ and Private Engineering Defendants' conduct, as these Defendants knew or should have known, had a significant effect upon the public right, as it produced the permanent and long-lasting effect of causing lead and other dangerous toxins to enter the Flint public water supply. .

475.   MDEQ and Private Engineering Defendants are liable for all damages arising from such public nuisance, including compensatory and exemplary relief.

476.   As a direct and proximate result of the above- named Defendants' conduct and/or  failures to act, Plaintiffs have suffered past, present and future personal injuries and property damage, including but not limited to: health problems, physical pain and suffering, loss of quality of life,  unreasonable interference with all aspects of daily living, quality of life and the use and enjoyment of the property, mental anguish, emotional distress,  humiliation, medical expenses,  and property damages, including but not limited to damaged plumbing and lost real property value,  stigma as well as punitive and/or exemplary damages.

## COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Plaintiffs v. MDEQ Defendants

477.  Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

478. As employees of the MDEQ, MDEQ Defendants were ministerial officers charged with the duty to follow and perform functions consistent with safe

drinking water Federal and State laws, rules, and regulations, including the duty to report the presence of lead and other toxic substances in the Flint water supply to the public and other appropriate agencies.

479.  With malicious intent, willful misconduct, and/or a wanton or reckless disregard and concern for whether injury would result, MDEQ Defendants acted dishonestly and in bad faith in failing to properly discharge the duties described above.   Instead, MDEQ Defendants intentionally concealed information and mislead the public and other government agencies about the presence of lead and other toxic substances in the Flint water supply.

480.  MDEQ Defendants' outrageous conduct in causing, prolonging, and obscuring Plaintiffs' exposure to toxic, lead contaminated water exceeds all bounds of decency in a civilized society.

481.  MDEQ Defendants' conduct caused severe distress to Plaintiffs.

482.  MDEQ Defendants' conduct was the proximate cause of Plaintiffs' injuries.

483.  As a direct and proximate result of the MDEQ Defendants' bad faith intentional conduct and/or  failure  to  act, Plaintiffs  have suffered past, present and future personal injuries, including but not limited to:  health problems, physical pain and suffering, loss of quality of life,  unreasonable interference with all aspects of daily living, quality of life and the use and enjoyment of the property,

120

mental anguish, emotional distress,  humiliation, medical expenses,  and property damages, including but not limited to damaged plumbing and lost real property value, stigma, as well as punitive and/or exemplary damages.

## COUNT VI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## Plaintiffs v. MDEQ and Private Engineering Defendants

484.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

485.   MDEQ Defendants and Private Engineering Defendants were in a special relationship to Plaintiffs, being persons and entities entrusted with the protection of their most basic needs – water, health, and safety.

486.   With a substantial lack of concern for whether injuries would result, MDEQ Defendants and Private Engineering Defendants inflicted emotional distress and mental anguish on Plaintiffs through, among other things, the following extreme, outrageous and shocking behavior:

    a.    Inflicting physical danger, battery, disease and illness for no acceptable purpose,

    b.    Disseminating lies and falsehoods as set forth, in detail above,

    c.    Concealing and covering up the true status of the contamination and attendant health risks, as set forth in detail above.

487.   MDEQ Defendants and Private Engineering Defendants placed Plaintiffs in a zone of physical danger, causing them severe emotional distress and mental anguish.

488.   Plaintiffs contemporaneously perceived immediate family members' suffering from serious injuries as the result of their exposure to contaminated water.

489.   The experience of perceiving immediate family members suffering from serious injuries caused Plaintiffs to suffer shock which resulted in actual physical harm.

490.   The above-named Defendants' grossly negligent acts were the proximate cause of Plaintiffs' contemporaneous perception of their loved ones exposure to contaminated water.

491.   The above-named Defendants' grossly negligent acts were the proximate cause of Plaintiffs being placed into a zone of physical danger and resulting severe emotional distress.

492.   The above-named Defendants' grossly negligent acts were the proximate cause of Plaintiffs' severe emotional distress and mental anguish related to their own exposure and their families' exposure to lead contaminated water.

493.   The physical harm, distress and mental anguish caused by MDEQ Defendants and Private Engineering Defendants to Plaintiffs were highly foreseeable.

494.   As a direct and proximate result of the above-named Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to:  health problems, physical pain and suffering, loss of quality of life,  unreasonable interference with all aspects of daily living, quality of life and the use and enjoyment of the property, mental anguish, emotional distress,  humiliation, medical expenses,  and property damages, including but not limited to damaged plumbing and lost real property value, stigma, as well as punitive and/or exemplary damages.

## COUNT VII: INVERSE CONDEMNATION
### Plaintiffs v. Government Defendants

495.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

496.   Article 10, § 2 of the Michigan Constitution of 1963 provides that "[p]rivate property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law."

497.   The actions of the State of Michigan, MDEQ, MDHHS, Governor Snyder, Andy Dillon, Emergency Managers, MDEQ Defendants, Nick Lyon, Eden Victoria Wells, M.D., Daniel Wyant, and Jeffery Wright, all acting in their official

123

capacities, (together, "Government Defendants") constitute an unconstitutional taking of Plaintiffs' property without due process of law and without just compensation under Michigan law.

498.   The Government Defendants abused their power by making the affirmative decision to switch the Flint water system from water provided by the DWSD to water sourced from the Flint River, despite knowledge of the danger posed by Flint River's corrosive water, and without a state-conducted scientific assessment of the suitability of the use of Flint River water as a source of drinking water.

499.   As described more fully above, the Government Defendants concealed data and made false statements in an attempt to downplay the health dangers posed by using Flint River water.

500.   The Government Defendants' conduct was directly aimed at the property of Plaintiffs as Flint River water entered pipes connected with and flowing into Plaintiffs' property.

501.   The Government Defendants caused Plaintiffs' property (including, but not limited to, underground and interior pipes, plumbing fixtures, and appliances) to be actually and physically invaded by water containing corrosive chemicals.  These chemicals permanently corroded and rendered useless and

valueless Plaintiffs' property, diminished the value of Plaintiffs' real property, and otherwise encroached on Plaintiffs' use and enjoyment of their property.

502.   The Government Defendants proximately and substantially caused damage to Plaintiffs' property and the decline of Plaintiffs' property values.

503.   The Government Defendants undertook the affirmative acts set forth in this Count for a public purpose- namely, to reduce the cost to the City and its residents of providing water to the residents of Flint.

504.   Under Michigan law, there is no governmental immunity for violations of state constitutional rights, including the right to due process and just compensation for takings of property for public use.

505.   Plaintiffs are entitled to just compensation for property damage and the diminution in the value of their property caused by the Government Defendants' affirmative acts, in an amount to be determined at trial.

## COUNT VIII: 42 U.S.C. § 1983 – 14th  AMENDMENT PROCEDURAL DUE PROCESS –  STATE CREATED DANGER: Plaintiffs v. Individual  Government Defendants

506.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

507.   Governor Snyder, Andy Dillon, Emergency Managers, MDEQ Defendants, Nick Lyon, Eden Victoria Wells, M.D., Daniel Wyant, and Jeffery Wright ("Individual Government Defendants"), acting under color of state law,

125

deprived Plaintiffs of their property without providing an adequate post-deprivation remedy, in violation of 42 U.S.C. § 1983.

508.   At all times relevant to this Complaint, each Individual Government Defendant acted under the color of state law.

509.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution says that no state shall "deprive any person of life, liberty, or property, without due process of law."  The Due Process Clause establishes Plaintiffs' constitutional rights to be free from deprivations of private and state-created property interests, without due process of law.

510.   The Individual Government Defendants, in their actions and omissions, intentionally and/or with deliberate indifference to an unreasonable risk of harm, injured Plaintiffs and deprived them of their constitutionally guaranteed property interests by providing and selling Plaintiffs unusable water that they knew or should have known was contaminated with lead; failing to take remedial measures they knew or should have known would prevent further harm; and failing to warn Plaintiffs of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in their homes and rental properties, despite Governmental Defendants' actual or constructive knowledge that this failure to warn would cause harm.

511.   At all times relevant to this Complaint, it was clearly established in

126

the laws of this jurisdiction that no person may, acting under color of state law, deprive citizens of the United States or persons within the territorial jurisdiction thereof of property without due process of law.

512.   Emergency Manager Defendants were officials with final policy-making authority for the City of Flint.  Their decisions not to remedy known contamination, and to misinform the public about the safety of Flint water, represented the official policy of the City of Flint.

513.   The Individual Government Defendants had a custom or practice of providing contaminated water to Flint residents, of not remediating known contamination, and of misinforming the public about the safety of its water systems.

514.   The Individual Government Defendants had a policy of deliberate indifference to potential harm with respect to the training and supervision of the staff responsible for providing safe drinking water to Flint residents.  In the alternative to the state law tort claims set forth in this Complaint, there exists under Michigan law no meaningful post-deprivation remedy for Defendants' deprivations of Plaintiffs' liberty and property interests.

515.   The unlawful acts complained of in this Count proximately caused Plaintiffs to suffer harms including but not limited to property damages. Moreover, the unlawful acts complained of in this Count continue to deprive

Plaintiffs of their constitutional rights, and to proximately cause damages on an ongoing basis.

516.   This Count is brought against Individual Government Defendants in both their individual and official capacities.

517.   With respect to Individual Government Defendants sued in their individual capacities, Plaintiffs are entitled to compensatory and special damages in an amount to be determined at trial as well as punitive damages.

518.   With respect to Individual Government Defendants in their official capacities, Plaintiffs are entitled to prospective declaratory and injunctive relief from ongoing deprivations of their liberty and property interests.

**COUNT IX: 42 U.S.C. § 1983 – 14th  AMENDMENT SUBSTANTIVE DUE PROCESS –  STATE  CREATED DANGER: Plaintiffs v. Individual  Government Defendants**

519.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

520.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

521.   Individual Government Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

522.   Individual Government Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited and ignored said known dangers and risks of harm to which they exposed Plaintiffs, making them more vulnerable to said dangers in violation of 42 U.S.C. § 1983.

523.   Individual Government Defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

524.   This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

525.   The dangers and risks of harm were discreet and special to Plaintiffs, as Flint water users and property owners in particular, and not risks affecting the public at large.

526.   The dangers and risks of harm to Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by Individual Government Defendants were so extreme as to be equivalent to private acts of violence visited upon them.

527.   The actions of Individual Government Defendants constitute affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to the Plaintiffs.

528.   As a direct and proximate result of the unconstitutional acts of Individual Government Defendants as alleged herein, Plaintiffs suffered and continue to suffer violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

> a. Serious and in some cases life threatening and irreversible bodily injury;
>
> b. Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;
>
> c. Pain and suffering;
>
> d. Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

130

529.   Plaintiffs have further suffered property damage to their homes and/or places of business and/or properties in the form of lost property values and lost business profits.

530.   This Count is brought against Individual Government Defendants in both their individual and official capacities.

531.   With respect to Individual Government Defendants sued in their individual capacities, the conduct of Individual Government Defendants was reckless and outrageous that it entitles Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

532.   With respect to Individual Government Defendants sued in their official capacities, Plaintiffs are entitled to prospective declaratory and injunctive relief from ongoing deprivations of their liberty and property interests.

## COUNT X: 42 U.S.C. § 1983 – 14TH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY: Plaintiffs v. Individual Government Defendants

533.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

534.   Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

535. The conduct of Individual Government Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

536. Individual Government Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

537. Individual Government Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs in violation of 42 U.S.C. § 1983.

538. Individual Government Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

539. As a direct and proximate result of the unconstitutional acts of Individual Government Defendants as alleged in this First Amended Complaint, Plaintiffs have suffered, and continue to suffer, violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

    a. Serious and in some cases life threatening and irreversible bodily injury;

    b. Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c. Pain and suffering;

    d. Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

540.   This Count is brought against Individual Government Defendants in both their individual and official capacities.

541.   With respect to Individual Government Defendants sued in their individual capacities, the conduct of Individual Government Defendants was reckless and outrageous that it entitles Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

542.   With respect to Individual Government Defendants sued in their official capacities, Plaintiffs are entitled to prospective declaratory and injunctive relief from ongoing deprivations of their liberty and property interests.

**COUNT XI:  42 U.S.C. § 1983 – 5TH AND 14TH AMENDMNETS
EQUAL PROTECTION OF THE LAW:  RACE-BASED
DISCRIMINATION
Plaintiffs v. Snyder, Dillon, Clinton, Wright, Ambrose, Kurtz & Earley**

543.   Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

544.   Defendants Snyder, Dillon, Clinton, Wright, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official

capacities, engaged in conduct and/or adopted laws and policies that violated

Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States

Constitution.

545.   Amendment Fourteen, § 1 states in pertinent part, "No state shall

make or enforce any law which shall … deny to any person within its jurisdiction

the equal protection of the laws."

546.   The Equal Protection Clause protects laws and the application of laws

that invidiously discriminate between similarly situated individuals or between

groups of persons in the exercise of fundamental rights.

547.   Defendants' conduct deliberately exposed Plaintiffs to contaminated

Flint River water, knowing that it could and would result in widespread serious

damage.

548.   In 2013, Defendants were required to develop an Interim Plan to

deliver water to Genesee County and Flint while the KWA water system was being

built.  This Interim Plan would be in effect for more than 2.5 years (April 25, 2014

until approximately October 2016 when the KWA water system would become

operational.)

549.   These Defendants knew that the water from the Flint River was

grossly inferior to the Lake Huron water Flint Genesee County citizens had been

receiving from DWSD.

550.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which would have required millions of dollars of upgrades.

551.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

552.   Recognizing these facts, Defendants devised an Interim Plan that caused the predominately white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of the predominately African American Flint community received water that was known to be grossly inferior and unsafe, i.e. Flint River water.

553.   As evidence of the fact that race discrimination was the reason for treating the two groups of water users differently, the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

554.   Given the clear difference in the treatment between these two groups of similarly situated water users, the deliberate and intentional decisions and actions of these Defendants in devising the Interim Plan was the product of racial discrimination in violation of the Equal Protection Clause.

555.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated in the same manner as their predominately white neighbors in Genesee County and they would have received DWSD water as part of the Interim Plan.

556.   Because Plaintiffs were water users in a predominately African American community, their complaints were dismissed and disrespected as exaggerated, without merit or inconsequential.  If Plaintiffs' community had been predominately white, citizen complaint would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to address their concerns.

557.   Both Governor Snyder's Task Force and the Michigan Civil Rights Commission have acknowledged that the residents of Flint were denied equal protection of the laws.  Governor Snyder's Task Force found that Flint residents, who are majority Black or African American and among the most impoverished of any metropolitan area in the United States, did not enjoy the same degree of protection from environmental and health hazards as that provided to other communities.  And the Michigan Civil Rights Commissions found that people of Flint did not enjoy the equal protection of environmental or public health laws, nor did they have a meaningful voice in the decisions leading up to the Flint Water Crisis.

136

558. As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Complaint, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

    a. Serious and in some cases life threatening and irreversible bodily injury;

    b. Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c. Pain and suffering;

    d. Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

559. The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

## COUNT XII – 42 U.S.C. § 1985(3) RACE-BASED DISCRIMINATION CONSPIRACY
### Plaintiffs v. Snyder, Dillon, Clinton, Wright, Ambrose, Kurtz & Earley

560. Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

561. Defendants Snyder, Dillon, Clinton, Wright, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Thirteenth Amendments to the United States Constitution.

137

562.   42 U.S.C. § 1985 (3) secures the rights of the Plaintiffs to be free from conspiracies, founded on invidious racial animus, to violate the constitutional rights of Plaintiffs to equal protection and due process.

563.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

564.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

565.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built.  This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

566.   These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

567.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which required millions of dollars of upgrades.

568.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

569.   Recognizing these facts, Defendants' conspired to devise an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe superior water from DWSD and the predominately black water users of Flint to receive the grossly inferior, previously rejected and potentially unsafe Flint River water.

570.   There was no rational economic or fiscal justification for treating the predominately white water users of those parts of Genesee County outside of Flint differently than the water users in the predominately African American community of Flint because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

571.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of invidious racial animus in

139

violation of the Thirteenth Amendment.  The provision of unhealthy and dangerous food and water is a badge, vestige and symbol of slavery abolished and prohibited by the Thirteen Amendment.

572.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated the same as their white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

573.   Because Plaintiffs were water users in a predominately African American community, their complaints were disrespected and dismissed as exaggerated, without merit or inconsequential.  If Plaintiffs' community had been predominately white, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.  This disrespect and dismissive response arose directly from the conspiracy between these Defendants founded on invidious racial animus.

574.   As a direct and proximate result of the conspiracy and the unconstitutional acts of Defendants as alleged in this Complaint, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

     a.  Serious and in some cases life threatening and irreversible bodily injury;

     b.  Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.   Pain and suffering;

    d.   Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

575.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

## COUNT XIII: NREPA, MCL 324.20101 ET SEQ.
## Plaintiffs v. State of Michigan

576.   Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

577.   The Flint water system meets the definition of "facility" under the Michigan Natural Resources and Environmental Protection Act ("NREPA") because it is an area, place or property where a hazardous substance, i.e. lead, in excess of the concentrations which satisfy the requirements of the statute, has been released.

578.   Defendant State of Michigan was the operator of the facility by virtue of its takeover of the operations of Flint through the Emergency Manager's Act.

579.   Hazardous substances, including lead, have been released from this facility into the environment.

580.   As set forth more fully above, the State knew that, as a result of its actions, and failure to act, Flint River water distributed to the residents of Flint was not safe to drink or otherwise use, yet knowingly continued to distribute that water.

141

581.  As more fully described above, Individual Government Defendants, acting on behalf of the State of Michigan, falsely represented that the Flint River water was potable and suitable for use, knowing such statements were false, and intending that Plaintiffs and other residents of Flint would rely on those statements in continuing to use the Flint River water.

582.  "Response Activity" is defined under the statute to include "the taking of … actions necessary to protect the public health, safety or welfare" and "also includes health assessments or health effect studies carried out under the supervision, or with the approval of the Department of Public Health."   MCL 324.20101 (1)(ee).

583.  Under MCL 324.20135 "a person … whose health or enjoyment of the environment is or may be adversely effected by a release from a facility or a threat of a release may commence a civil action against the operator of a facility for injunctive relief necessary to prevent irreparable harm to the public's health, safety or welfare."

584.  Plaintiffs are persons whose health or enjoyment of the environment is, or may be adversely affected by the release of lead and other toxic contaminants – as set forth more fully above – from the Flint Water System facility and seek the following injunctive relief:

a.  Medical monitoring;

142

b. Diagnostic testing; and

c. Health effect studies.

## COUNT XIV: RELIEF FOR DIAGNOSTIC MEDICAL AND PSYCHOLOGICAL/COUNSELING SERVICES, INTERVENTION, AND TREATMENT
### Plaintiffs v. Defendants

585.   Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

586.   In the alternative, if the foregoing injunctive relief is not available under the Eleventh Cause of Action above, under NREPA, then for the reasons set forth more fully above and below, the Court should grant the foregoing relief in the exercise of its equitable jurisdiction.

587.   The foregoing is well-documented and publicized, thoroughly covered in the media and easily accessible on the internet.  As such, the contamination affecting Flint is well-known within and without this jurisdiction.

588.   The devastating impacts of prolonged exposure and re-exposure to lead and other toxic substances are well known in the scientific and medical community, and are far reaching.

589.   The most obvious and visible damages are to both the infants and adults who were exposed and re-exposed to lead who have suffered damages to bodily organs as a direct result of being continually exposed to Flint's toxic water supply  over an extended period of nearly two years.

590.   The less immediately apparent, but equally devastating, damages that will be caused as a direct result of the exposure, and re-exposure to lead have yet to be diagnosed and/or determined.

591.   It is well established both medically and scientifically, that a person with an elevated blood lead level will never fully eliminate this toxic substance from their body.

592.   All Plaintiffs have suffered emotional distress as a proximate result of defendant's negligent conduct which has manifested itself in physical and objective symptoms, including but not limited to, the inability to perform ordinary household duties, extreme nervousness and irritability and other symptoms caused by emotional distress, distrust and lack of faith in their government, elected officials, and public infrastructure.

593.   The devastating impacts of prolonged toxic lead exposure are well known in the scientific and medical community, and are far reaching.

594.   These harms may include irreversible brain damage, loss in IQ, and social and developmental issues and deficits which have been undisputedly linked to lead exposure, and further include social and psychological stigma as a result of living in a contaminated community.

595.   Accordingly, as a result of being exposed to lead and other contaminants for an extended period, and as a result of being manipulated and

144

deceived by their own government and its elected and un-elected officials and agents, Plaintiffs seek psychological and educational programs and services, each to be provided at defendants' expense but independently administered.

596.   The relief plaintiffs seek is one for which there is no adequate remedy at law.

597.   The unique and special circumstances of this case - which include the fact that the government and its agents are responsible for the contamination and exposure, that the government and its agents participated in a cover-up and concealed the contamination and its exposure, and knowingly encouraged Flint residents to consume and use unsafe, unpotable water, the perpetuation and exacerbation of harms as a result of defendants knowing misrepresentations, and the creation of a stigma affecting all Plaintiffs – in addition to the inadequacy of any legal remedy to redress the lasting and substantial harms suffered by Plaintiffs and the importance of the requested relief in ameliorating those harms.

## VII.   **DEMAND FOR JURY TRIAL**

598.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

## VIII.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that the Court grant them:

A.   An order declaring Defendants liable for each Cause of Action

as stated above.

B.   Compensatory damages for injuries to person and property, as

detailed above.

C.   Compensatory damages for costs associated with necessary

diagnostic medical intervention, treatment and assessment,

psychological intervention and counseling and future medical care;

as well as any punitive damages or disgorgement monies owed to

Plaintiffs.

D.   Consequential damages.

E.   Any and all other damages as outlined above.

F.   Fees, costs and such other relief as this Court may deem fair and

just.

Dated:  April 13, 2017

Respectfully submitted,

*/s/ Esther Berezofsky*

By:_____

Esther Berezofsky, Esq.

Mark R. Cuker, Esq. (*Pro Hac Vice* Pending)

Sarah T. Hansel, Esq. (*Pro Hac Vice* Pending)

WILLIAMS CUKER BEREZOFSKY, LLC

210 Lake Drive East, Suite 101

Cherry Hill, New Jersey 08002

(856) 667-0500 (tel)

(856) 667-5133 (fax)

Email:  eberezofsky@wcblegal.com

mcuker@wcblegal.com

shansel@wcblegal.com

146

Valdemar L. Washington P-27165
Attorney for Plaintiffs
718 Beach Street
P.O. Box 187
Flint, MI 48501-0187
810.407.6868
vlwlegal@aol.com